Karim **MENEBHI**, Plaintiff,

v.

Thomas **MATTOS**, in his capacity as Finance Director for the Town of East Greenwich; William F. Higgins, individually and as Detective Lieutenant for the Town of East Greenwich Police Department, Defendants.

No. 00–27–L.

United States District Court,
D. Rhode Island.

Feb. 11, 2002.

Joseph J. Rodio, Michael W. Murphy, Rodio & Ursillo, Ltd, Providence, RI, Edward C. Roy, Jr., Roy & Cook, Providence, RI, for Plaintiff.

Edmund L. Alves, Kristin Rodgers Sullivan, Blish & Cavanagh, Providence, RI, for Defendants.

### Decision and Order

LAGUEUX, Senior District Judge.

This matter is presently before the Court on defendants' motion for summary judgment. Plaintiff Karim Menebhi ("Menebhi") brought this action against defendant Thomas Mattos ("Mattos"), in his official capacity as Finance Director for the Town of East Greenwich, Rhode Island ("East Greenwich"), and defendant William Higgins ("Det. Lt. Higgins"), individually and in his capacity as Detective Lieutenant for the East Greenwich Police Department. Plaintiff brought this action against defendants pursuant to 42 U.S.C. § 1983. His complaint also contains state law claims for false arrest, malicious pros-

ecution, abuse of process, defamation, negligent supervision, and negligent hiring. Defendants contend that Det. Lt. Higgins lawfully arrested plaintiff and that in any event, there is no liability because of the doctrine of qualified immunity.

For the following reasons, this Court concludes that the doctrine of qualified immunity shields defendants from liability for plaintiff's § 1983 claims. In addition, plaintiff has failed to show that defendants violated any of his constitutional rights, and therefore, there is no § 1983 liability. Consequently, defendants' motion for summary judgment is granted on Counts I, II, III, and IV of the Complaint. The Court, however, declines to exercise jurisdiction over Counts V, VI, and VII of the Complaint, which involve issues of state law, and therefore, dismisses those claims without prejudice.

### I. Background

On a motion for summary judgment, the Court must view all evidence and related reasonable inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.,* 133 F.3d 103, 106 (1st Cir.1997). The following factual recital is constructed with that rule of law in mind.

*The Criminal Investigation*

On August 3, 1999, Toni Raimondo ("Raimondo") and Amiee Merritt ("Merritt") filed written statements with the East Greenwich Police Department regarding the conduct of their employer, Menebhi. Menebhi is President of Loans for Homes, a mortgage brokerage company located in East Greenwich. At the time they filed their written statements with the police, Raimondo was employed as a loan officer at Loans for Homes and Merritt had been terminated from Loans for Homes on that day.

In Raimondo's written statement, she provides the following account of her encounter with plaintiff on August 3, 1999. She stated that on that day, at approximately 3:00 p.m., David Travers ("Travers"), Raimondo's co-worker at Loans for Homes, approached her at her desk and asked Raimondo to follow him to the rear door of the office building. She followed Travers to the rear of the building. Upon exiting the building, she noticed that plaintiff and Lou St. Germain ("St.Germain"), the Vice President of Loans for Homes, were sitting in plaintiff's car.

Travers opened the rear driver's-side door of plaintiff's car and told Raimondo to get into the car. Once she and Travers were both in the car, plaintiff began to drive away and told her to "duck down," which she did. As she ducked down, she asked plaintiff why he wanted her to duck. In response, he explained to Raimondo that he did not want Merritt, who was outside smoking a cigarette with another co-worker, to see her. Raimondo told the police that she was in shock and disbelief that plaintiff asked her to "duck down" and did not understand at the time what difference it made if Merrit saw her leaving with plaintiff.

According to Raimondo's police statement, plaintiff then drove the car to Mulberry Street, a restaurant located in East Greenwich, a short distance from the Loans for Homes office building. Plaintiff, Raimondo, Travers, and St. Germain entered Mulberry Street and sat on the left-side of the restaurant. When they were seated, plaintiff told her that he had met with his attorney and that he was going to fire Merritt when they got back to the office. He explained to Raimondo that he was going to terminate Merritt because of rumors that were circulating at Loans for Homes about him and an incident that

occurred on July 23, 1999, involving Raimondo.[1]

Raimondo told the police that plaintiff then handed her a pad of paper and asked her to write a statement negating the rumors that were circulating at Loans for Homes about him. He also told her that "if [she] wrote the wrong thing, then he would have a problem with [her]." App. Ex. in Supp. Pl.'s Objection Defs.' Mot. Summ. J., at Ex. 9. According to Raimondo, plaintiff told her to write the following: that plaintiff had never made Raimondo feel uncomfortable and that he had not made any sexual passes at her; that he had been nothing but professional towards her for the past four months (the length of Raimondo's employment); and that the rumors regarding the July 23, 1999 event at Twenty Water Street were false. Plaintiff then told her to sign the statement.

Raimondo told the police that she wrote the statement even though she did not want to do it. She explained that she wrote it because she assumed that if she did not write it, she would be fired. Raimondo acknowledged in her police statement that plaintiff had not made any specific threats towards her. He had told her, however, that "there would be a problem" if she did not do what he said. Raimondo explained that she understood plaintiff's demand to mean that she would lose her job if she did not write the statement.

Shortly after writing and signing the statement, plaintiff, St. Germain, Raimondo, and Travers left Mulberry Street and returned to work at Loans for Homes. Raimondo told the police that once the four of them returned to the office, she grabbed her personal belongings and left because she was upset about what had just transpired. She felt as if she "[had done] something really wrong." App. Ex. in Supp. Pl.'s Objection Defs.' Mot. Summ. J., at Ex. 9. According to her police statement, shortly after leaving Loans for Homes, Raimondo contacted her attorney, Steve Delibero, who scheduled an appointment with her for the next morning and advised her not to return to work.

On August 3, 1999, Merritt also provided a written statement to the East Greenwich police. She told the police that earlier that day, at approximately 3:45 p.m., she met with plaintiff and St. Germain in plaintiff's office. According to Merritt, plaintiff told her that "this is not working out" and gave her a number of reasons for her termination. Merritt told the police that she believed that plaintiff was "making up" the reasons for her termination because they were not "specific enough" and they were "minimal complaints in [the mortgage brokering business] and definitely not worth getting fired over." App. Ex. in Supp. Pl.'s Objection Defs.' Mot. Summ. J., at Ex. 10.

After Merritt's meeting with plaintiff, she encountered Morris, who worked

---

1. According to Raimondo's police statement, on July 23, 1999, she and Merritt went to Twenty Water Street, a bar located in East Greenwich, after work. Plaintiff and St. Germain arrived at the bar shortly thereafter. Raimondo stated that while she was at Twenty Water Street, plaintiff "was very persistent" with her throughout the evening, asking Raimondo to get a room with him at Foxwoods Casino. Each time plaintiff approached her, she told plaintiff that she would not leave with him. Raimondo recalled that the last time she rebuffed plaintiff, he became loud and demanding and told her "this is your last chance." Raimondo told the police that she understood his comment to mean that if she did not comply with his request, she would lose her job. She also noted that Merritt and Brian Morris ("Morris"), the owner of another company located in the same building as Loans for Homes, overheard plaintiff's July 23, 1999 statement regarding Raimondo's "last chance."

across the hall from the Loans for Homes office space and was a friend of Merritt and Raimondo. Morris told her that Raimondo was upset and had gone to Felicia's Coffee Shop ("Felicia's"). According to her written statement, after clearing her desk of her personal belongings, Merritt left Loans for Homes and met Raimondo at the coffee shop. While they were sitting in Felicia's, Raimondo told Merritt about her encounter with plaintiff at Mulberry Street earlier that day. She also told Merritt about the statement that she wrote for plaintiff. Merritt recalled asking Raimondo whether there was anyone at Mulberry Street who had witnessed the encounter between Raimondo and plaintiff. According to Merritt, Raimondo had remembered that a bartender had been in the restaurant during the time that she was there with plaintiff, St. Germain, and Travers. In her police statement, Merritt recounted that she and Raimondo left Felicia's Coffee Shop and went to Mulberry Street, where they obtained a written statement from the bartender who had witnessed the encounter between plaintiff and Raimondo earlier that day.

On August 3, 1999, after the women gave their statements to the police, Patrolman Cirella summarized the statements into a police narrative. He then presented the written statements to Lieutenant Mason Rhodes ("Lt.Rhodes") and Colonel Lawrence Campion ("Col.Campion"), the Chief of the East Greenwich Police Department.

During the evening of August 3, 1999, after reviewing the information provided by Raimondo and Merritt, Lt. Rhodes and Col. Campion assigned Det. Lt. Higgins to review and investigate the incident reported by the two women. On August 4, 1999, Det. Lt. Higgins initiated his investigation by taking additional written statements from Raimondo and Merritt. Raimondo's

and Merritt's August 4, 1999 written statements provided a more detailed account of the July 23, 1999 incident at Twenty Water Street involving Raimondo and plaintiff.

On August 4, 1999, Det. Lt. Higgins also taped (and later transcribed) two telephone conversations from the East Greenwich Police Department. The first taped telephone conversation was between Raimondo and Travers. The second taped telephone conversation was between Raimondo and plaintiff. Neither plaintiff nor Travers was aware that their conversations were being recorded.

At various times during the conversation between Raimondo and plaintiff, plaintiff told her that her job at Loans for Homes was not in jeopardy and would not have been in jeopardy, had she decided not to write the statement that he had asked her to write. The transcript of the taped telephone conversation also indicates that plaintiff repeatedly denied forcing Raimondo to write the statement.

On August 4, 1999, in addition to taping the two telephone conversations, Det. Lt. Higgins also met with, interviewed, and witnessed written statements from Mark Roy ("Roy"), Morris, and Robert Centracchio ("Centracchio"). Roy is a Loans for Homes' employee, and Centracchio is the bartender at Mulberry Street who had been working the afternoon of August 3, 1999. In Roy's police statement, he recounted his knowledge of the rumors circulating at Loans for Homes regarding plaintiff "sleeping with or wanting to sleep with" Raimondo. App. Ex. in Supp. Pl.'s Objection Defs.' Mot. Summ. J., at Ex. 16. He also recalled that plaintiff confronted him about the rumors either on August 2, 1999, or August 3, 1999, and had claimed that the rumors were false.

Morris provided the police with a written statement regarding his observations of the July 23, 1999 encounter between

plaintiff and Raimondo at Twenty Water Street. In his statement, Morris told the police that he witnessed plaintiff approaching Raimondo a number of times that evening and that he had overheard plaintiff tell Raimondo that this was her "last chance" to go to Foxwoods with him. App. Ex. in Supp. Pl.'s Objection Defs.' Mot. Summ. J., at Ex. 17. He also recalled that on August 3, 1999, Raimondo told him that plaintiff had asked her to sign a document, which she did because she feared that she would lose her job if she refused.

Det. Lt. Higgins also obtained a witness statement from Centracchio, the bartender at Mulberry Street who had seen plaintiff with Raimondo in the restaurant on the afternoon of August 3, 1999. Centracchio told Det. Lt. Higgins that Raimondo was in the restaurant with three men, one of whom had identified himself to Centracchio as Karim Menebhi. He recalled that "someone was writing something on a white pad;" but, he did not remember whether that individual was Raimondo or another person.

After obtaining written statements from Roy, Morris, and Centracchio, Det. Lt. Higgins called Assistant Attorney General Danica Iacoi ("Asst. AG Iacoi"). Asst. AG Iacoi was assigned to respond to calls from the East Greenwich Police Department during off duty hours. Asst. AG Iacoi stated that on or about August 5, 1999, Det. Lt. Higgins and she had discussed the status of his investigation of plaintiff. According to an affidavit written and signed by Asst. AG Iacoi, she does not recall the specifics of her conversation with Det. Lt. Higgins.

She did recall, however, that Det. Lt. Higgins informed her that plaintiff was involved in allegations of sexual harassment and that "Mr. Menebhi threatened one of the women to support his denial of these allegations or there would be conse-

quences regarding her employment." App. Ex. in Supp. Pl.'s Objection Defs.' Mot. Summ. J., at Ex. 19. Asst. AG Iacoi stated that she had advised Det. Lt. Higgins to speak with Assistant Attorney General Barry Capalbo ("Asst. AG Capalbo") on the next scheduled East Greenwich Police Department screening day about presenting the case for information charging. Det. Lt. Higgins did not wait to speak with Asst. AG Capalbo. Instead, on August 5, 1999, he began preparing the affidavit and an application for an arrest warrant for a felony charge of extortion against plaintiff.

*The Arrest Warrant and Accompanying Affidavit*

The application for the arrest warrant and accompanying affidavit prepared by Det. Lt. Higgins outlined the facts as elicited from Raimondo's August 3, 1999 and August 4, 1999 statements to the police. The affidavit also contained information obtained from Merritt's August 3, 1999 and August 4, 1999 statements and the August 4, 1999 statement of Centracchio, the bartender at Mulberry Street. Merritt's and Centracchio's statements served to corroborate Raimondo's account of her encounter with plaintiff on August 3, 1999.

Neither the application for the arrest warrant nor the affidavit, however, contained any reference to the August 4, 1999 taped conversation between plaintiff and Raimondo. In that taped telephone conversation, plaintiff repeatedly denied ever forcing Raimondo to write the statement for him. The affidavit, furthermore, varied from the statements Raimondo made to the police on August 3, 1999. Specifically, in paragraph 2 of the affidavit, Det. Lt. Higgins wrote that Raimondo *knew* that she would be fired when plaintiff told her that if she wrote the wrong thing, "he would have a problem with [her]." App. Ex. in Supp. Pl.'s Objection Defs.' Mot. Summ. J., at Ex. 21. In Raimondo's Au-

gust 3, 1999 statement to the police, however, she stated that she "assumed that if [she] did not write this statement in Karim's words then I would be fired" and that she "thought it meant [her] job since [she] had no other connection to this person." App. Ex. in Supp. Pl.'s Objection Defs.' Mot. Summ. J., at Ex. 9.

On August 5, 1999, Det. Lt. Higgins presented the affidavit and accompanying application for an arrest warrant to Third Division District Court Judge Stephen Erickson ("Judge Erickson"). That same day, after reviewing Det. Lt. Higgins' affidavit, Judge Erickson issued the arrest warrant and signed the accompanying criminal complaint. On August 9, 1999, a few days after Judge Erickson issued the arrest warrant, plaintiff voluntarily turned himself in to the East Greenwich Police Department and was arrested. Shortly after his arrest, that same day, plaintiff was arraigned and released on his personal recognizance.

*The Providence Journal Article*

On August 19, 1999, less than two weeks after his arrest, the Providence Journal published an article entitled, "Businessman Threatened Employee After Propositioning Her, Police Say," regarding the criminal charges filed against plaintiff. The article contained a number of quotes attributed to Det. Lt. Higgins regarding the allegations against plaintiff as set forth in the affidavit.

*The Dismissal of the Criminal Complaint*

On October 25, 1999, Asst. AG Barry Capalbo, who was responsible for felony screenings in Kent County and Third Division District Court, was presented with the extortion charge against plaintiff for felony screening. On that day, after reviewing both the pre-arrest and post-arrest evidence presented by Det. Lt. Higgins, including the August 4, 1999 taped telephone conversation between plaintiff and Raim-

ondo, Asst. AG Barry Capalbo dismissed the charges against plaintiff.

*Plaintiff's Lawsuit Against Defendants*

On January 14, 2000, plaintiff commenced this action against Thomas Mattos, in his capacity as Finance Director for the Town of East Greenwich, and Det. Lt. Higgins, individually and as Detective Lieutenant for the Town of East Greenwich Police Department. Plaintiff argues that Det. Lt. Higgins lacked probable cause to arrest him, and therefore, defendants are liable to him for damages.

Specifically, plaintiff seeks to recover damages from defendants on seven grounds. Count I is a claim brought pursuant to 42 U.S.C. § 1983, which alleges that he was unlawfully arrested in violation of his Due Process Rights under the Constitution. Similarly, plaintiff alleges that because Det. Lt. Higgins lacked probable cause to arrest him, he is entitled to damages for false arrest, malicious prosecution, and abuse of process. Those claims are contained in Counts II, III, and IV of the Complaint, respectively. Count V is a defamation claim brought against Det. Lt. Higgins for allegedly making false and defamatory statements to the Providence Journal. In Count VI, plaintiff claims that East Greenwich breached its duty to exercise reasonable care and control over its agent, Det. Lt. Higgins, and thus, he seeks to hold East Greenwich liable for negligent supervision. Finally, Count VII alleges that East Greenwich is liable to plaintiff for its alleged negligent hiring of Det. Lt. Higgins.

Defendants answered the Complaint on February 1, 2000, and subsequently filed a motion for summary judgement. As previously noted, defendants contend that probable cause, in fact, did exist to arrest plaintiff. Defendants also argue that even if probable cause to arrest plaintiff did not

exist, they are, nevertheless, immune from liability based on the qualified immunity doctrine. The Court has heard oral argument and considered the briefs filed by the parties. Therefore, the motion for summary judgment is now in order for decision.

## II. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

Therefore, the critical inquiry is whether a genuine issue of material fact exists. "Material facts are those 'that might affect the outcome of the suit under the governing law.'" *Morrissey v. Boston Five Cents Sav. Bank,* 54 F.3d 27, 31 (1st Cir.1995)(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A dispute as to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

On a motion for summary judgment, the Court must view all evidence and related inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.,* 133 F.3d 103, 106 (1st Cir.1997). " [W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir.1995). Similarly,

"summary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.,* 777 F.Supp. 167, 169 (D.R.I.1991). Summary judgment is only available when there is no dispute as to any material fact and only questions of law remain. *See Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996). Additionally, the moving party bears the burden of showing that no evidence supports the nonmoving party's position. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. Discussion

In support of the summary judgment motion, defendants contend that plaintiff's § 1983 claims must fail for two reasons. First, defendants argue that probable cause in fact existed to support the arrest warrant issued by Judge Erickson, thus defeating the § 1983 claims. Second, defendants claim that they are entitled to judgment as a matter of law on Counts I, II, III, and IV of the Complaint because they are shielded from liability by application of the doctrine of qualified immunity.

Although this case can be decided on the merits by determining whether plaintiff has viable § 1983 claims, the overriding issue presented is whether the doctrine of qualified immunity applies to shield Det. Lt. Higgins and East Greenwich from liability in view of the undisputed facts in this case. Therefore, the Court will consider that issue first.

## A. Application of the Doctrine of Qualified Immunity

██ The doctrine of qualified immunity protects "government officials performing discretionary functions ... from

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mutter v. Town of Salem,* 945 F.Supp. 402, 405 (D.N.H.1996) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Importantly, the doctrine of qualified immunity is not a defense to liability; it preempts determinations of liability by immunizing government officials from lawsuits. *See St. Hilaire v. City of Laconia,* 885 F.Supp. 349, 354 (D.N.H.1995). Thus, the applicability of qualified immunity in a given case is a legal question for the Court to decide, and it is a question that this Court may resolve appropriately at the summary judgment stage. *See Ensey v. Culhane,* 727 A.2d 687, 691 (R.I.1999)(noting the appropriateness of determining the applicability of qualified immunity on summary judgment).

In order to determine whether the doctrine of qualified immunity is applicable to the conduct or actions of a law enforcement officer, the Supreme Court has instructed courts to utilize the "objective reasonableness" standard. *Malley v. Briggs,* 475 U.S. 335, 344, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)(holding that the objective reasonableness standard defines the doctrine of qualified immunity). The inquiry, as articulated by the Supreme Court, is whether a reasonably well-trained officer could have believed an arrest to be lawful, in light of clearly established law and the information the arresting officer possessed. *Id.* at 344–45, 106 S.Ct. 1092; *see also Ensey,* 727 A.2d at 691 (citing *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The flexibility inherent in the "objective reasonableness" standard has led courts to hold that "[e]ven law enforcement officers who 'reasonably *but mistak-*

*enly* conclude that probable cause is present' are entitled to immunity." *Ensey,* 727 A.2d at 691 (emphasis added).

Importantly, the objective standard applied to qualified immunity determinations is not without limitation. The Supreme Court has cautioned that law enforcement officers will not be immune from liability if, applying the "objective reasonableness" standard, it is impossible to conclude that a reasonably well-trained officer would have secured the arrest warrant. *See Malley,* 475 U.S. at 345, 106 S.Ct. 1092. In order to determine whether a reasonably well-trained officer would have secured an arrest warrant, however, it is important to understand the concept of probable cause.

B. The Existence of Probable Cause

The Supreme Court describes probable cause as a predicate for qualified immunity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). According to Supreme Court jurisprudence, probable cause to make an arrest exists where the facts and circumstances of which the arresting officer has knowledge would be sufficient to permit a reasonably prudent person, or one of reasonable caution, to conclude that an offense has been, will be or is being, committed. *Michigan v. De Fillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Thus, whether probable cause to arrest exists requires a nontechnical analysis that examines the totality of the circumstances. *See United States v. Cruz Jimenez,* 894 F.2d 1, 4 (1st Cir.1990).

It is noteworthy that a finding of probable cause does not require an actual showing of criminality. *See United States v. Grant,* 218 F.3d 72, 75 (1st Cir.2000) (stating that "[p]robable cause need not be tantamount to proof beyond a reasonable

doubt ... Probability is the touchstone"). A probable cause determination requires only a probability or substantial chance of illegal activity. *Hoffman,* 973 F.2d at 985–86. Indeed, the probable cause threshold is so low that the First Circuit has held that "[p]robable cause to arrest may be based on less than a fifty percent likelihood that the suspect is guilty." *Nowaczyk v. Town of North Hampton,* No. Civ. 97–635–JD, 2001 WL 274775, at *3 (D.N.H. March 15, 2001) (citing *Samos Imex Corp. v. Nextel Communications,* 194 F.3d 301, 303 (1st Cir.1999)). Probable cause and qualified immunity, therefore, are inextricably linked such that the determinative issue in a qualified immunity dispute is whether an officer reasonably believed that the information he or she possessed constituted probable cause. *See Lallemand v. Univ. of R.I.,* 9 F.3d 214, 215 (1st Cir.1993); *Strail v. Dept. of Children, Youth, & Families of R.I.,* 62 F.Supp.2d 519, 529 (D.R.I.1999).

In this case, plaintiff challenges Det. Lt. Higgins' finding of probable cause on two grounds. First, plaintiff alleges that Det. Lt. Higgins' investigation was inadequately conducted and, therefore, he could not have reasonably concluded that he had probable cause to arrest plaintiff on the extortion charge. Second, plaintiff claims that the affidavit prepared by Det. Lt. Higgins contains both material misrepresentations and omissions, which are crucial to the finding of probable cause. The Court will now address each of these contentions.

### 1. Adequacy of the Investigation

Plaintiff's first argument challenges the adequacy of Det. Lt. Higgins' criminal investigation. Specifically, plaintiff argues that Det. Lt. Higgins unreasonably relied on Raimondo's statement to form the basis of his probable cause determination be- cause he did not consider whether Raimondo had an ulterior motive to file the criminal complaint against him. Additionally, plaintiff claims that Det. Lt. Higgins' criminal investigation was inadequate because plaintiff's conduct as reported by Det. Lt. Higgins did not constitute the crime charged under Rhode Island law.

The critical inquiry here is whether Det. Lt. Higgins conducted his criminal investigation in an objectively reasonable manner. Although not adopting a per se rule, the First Circuit has held that a victim's statement will generally suffice to support probable cause. *Bryant v. Noether,* 163 F.Supp.2d 98, 108 (D.N.H. 2001) (citing *B.C.R. Transport Co. v. Fontaine,* 727 F.2d 7, 10 (1st Cir.1984)). "So long as a reasonably credible witness or victim informs the police that someone has committed a crime, the officers have probable cause to place the alleged culprit under arrest." *Woods v. City of Chicago,* 234 F.3d 979, 987 (7th Cir.2000); *see also B.C.R. Transport Co.,* 727 F.2d at 10; *Hotaling v. LaPlante,* 167 F.Supp.2d 517, 521 (N.D.N.Y.2001); *Mutter v. Town of Salem,* 945 F.Supp. 402, 406 (D.N.H.1996). Once a reasonably credible complaint has been made, the existence of probable cause does not depend upon the actual truth of the complaint. *Woods,* 234 F.3d at 987. Instead, the focal point is the officer's knowledge. *See id.*

In this case, there is no reasonable basis to conclude that Det. Lt. Higgins was negligent in relying on Raimondo's sworn, detailed statement to form the basis of his probable cause determination. Raimondo not only identified plaintiff by name but also described an encounter with plaintiff that is arguably within the bounds of R.I. Gen. Laws § 11–42–2. Additionally, as part of his criminal investigation of plaintiff, Det. Lt. Higgins obtained witness statements from Merritt and Centracchio,

which corroborated Raimondo's account of her encounter with plaintiff on August 3, 1999.

There is nothing in the record, furthermore, to suggest that Det. Lt. Higgins was aware or should have been aware of any alleged motive on the part of Raimondo and Merritt to "bolster a civil case." Plaintiff's accusation that Raimondo was not a credible victim because she may have had a motive to file a criminal complaint against him is simply that: an accusation that is unsupported by any facts in the record before the Court. The Court concludes, therefore, that Det. Lt. Higgins was entirely reasonable in his decision to rely on the information furnished by Raimondo, Merritt, and Centracchio, which formed the basis of his decision that probable cause existed to arrest plaintiff.

█ Similarly, the Court rejects plaintiff's argument that Det. Lt. Higgins lacked probable cause to arrest him because plaintiff's conduct as reported by Det. Lt. Higgins did not constitute the crime of extortion as charged under Rhode Island law. Rhode Island General Laws § 11–42–2 provides the following definition of extortion:

Whoever, verbally, or by a written or printed communication, maliciously threatens to accuse another of a crime or by a verbal or written communication maliciously threatens any injury to the person, reputation, property, or financial condition of another, or threatens to engage in other criminal conduct with intent to extort money or any unlawful pecuniary advantage, or with intent to compel any person from carrying out a duty imposed by law, shall be punished by imprisonment in the adult correctional institutions for not more than fifteen (15) years, by a fine of not more than

twenty-five thousand dollars ($25,000), or both.

R.I. Gen. Laws § 11–42–2.

It is plaintiff's contention that "[t]he facts and circumstances indicated in Det. Lt. Higgins' affidavit plainly do not establish an oral or written harm to a person or property." Pl.'s Mem. Law Supp. Objection to Def.'s Mot. Summ. J. at 30. Plaintiff attempts to support his position by arguing that it is particularly noteworthy that the Rhode Island Department of the Attorney General dismissed the charges against him on October 25, 1999.

Hindsight, however, is always twenty-twenty. Plaintiff's argument belies the real issue in this case, which is whether or not Det. Lt. Higgins acted reasonably in relying on the information provided by Raimondo, Merritt, and Centracchio to form the basis of his probable cause determination.

The record in this case demonstrates that Det. Lt. Higgins was informed that on August 3, 1999, plaintiff met with Raimondo at Mulberry Street and asked her to write a statement for him. The record also indicates that, according to Raimondo, plaintiff told her that if she did not write the statement for him, he would have a problem with her. The manner in which he made this request of Raimondo suggested to her that if she did not comply with plaintiff's request, her job would be in jeopardy. It was not unreasonable for Det. Lt. Higgins to conclude from this version of events, therefore, that plaintiff verbally threatened to fire Raimondo if she did not comply with his request in violation of § 11–42–2. The fact that an Assistant Attorney General decided to dismiss the charges against plaintiff has no bearing on the issue of qualified immunity.

Indeed, the mere fact that further investigation might have revealed a contrary conclusion is not sufficient to render Det.

Lt. Higgins' conduct unreasonable. *See Hotaling,* 167 F.Supp.2d at 522; *see also Nowaczyk,* 2001 WL 274775, at *7 ("Once a police officer has sufficient credible information to support a finding of probable cause, no further investigation is constitutionally necessary."). The protective umbrella of the qualified immunity doctrine does not require absolute accuracy nor does it require an officer to exhaust all possible avenues of investigation. *See Hotaling,* 167 F.Supp.2d at 522. In short, there was probable cause to prosecute plaintiff for extortion. Plaintiff is fortunate that Asst. AG Capalbo exercised his discretion not to pursue the matter.

### 2. Sufficiency of the Affidavit

In addition to plaintiff's argument regarding the adequacy of Det. Lt. Higgins' investigation, plaintiff alleges that the Detective lacked probable cause to arrest plaintiff because he withheld exculpatory evidence and made a knowing misrepresentation of fact in the affidavit he submitted to Judge Erickson. Plaintiff contends that, without these fatal flaws, no reasonable officer would have found that there was probable cause to arrest him for extortion.

Mere allegations, however, are not enough to sustain plaintiff's burden in this case. Indeed, in order to prevail in his argument, plaintiff must show: (1) that Det. Lt. Higgins "knowingly and deliberately, or with a reckless disregard for the truth, made the statements or omissions that create a falsehood in applying for a warrant;" and (2) that "such statements or omissions were material or necessary to the finding of probable cause." *See Wilson v. Russo,* 212 F.3d 781, 786–87 (3d Cir.2000). In determining whether plaintiff has met this burden, this Court is mindful that probable cause is measured by a low standard that requires only a fair

probability that the suspect—here, plaintiff—committed the crime. *See id.* at 789. Applying these principles to the facts of this case, the Court concludes that plaintiff has not made the necessary showing.

#### a. Omissions

First, plaintiff contends that in deciding whether to issue the arrest warrant, Judge Erickson would have wanted to know and should have been made aware of the August 4, 1999 taped telephone conversation between plaintiff and Raimondo. In that taped telephone conversation, plaintiff repeatedly denied ever forcing Raimondo to write a statement for him negating the rumors circulating in the office about him. Plaintiff argues that this information would have been of great value to Judge Erickson in determining whether there was probable cause to issue the arrest warrant. The Court disagrees.

 The standard for determining whether an omission is material is well-established in federal case law. "An omission is made with reckless disregard where the officer leaves out anything that a reasonable person would have known was the kind of matter that the judge would want to know in determining whether probable cause exists for the arrest." *Freeman v. Murray,* 163 F.Supp.2d 478, 485–86 (M.D.Pa.2001) (citing *Wilson v. Russo,* 212 F.3d 781, 786–88 (3d Cir.2000)); *see also Hilaire,* 885 F.Supp. at 354–55. Applying this standard to the facts of this case, this Court finds that Det. Lt. Higgins' failure to provide Judge Erickson with a transcript of the August 4, 1999 taped telephone conversation was not a material omission.

The alleged exculpatory evidence that plaintiff claims would have been significant to Judge Erickson is, in essence, a claim of innocence of the crime. The Court concludes that this information would have

been of little probative value to Judge Erickson in his decision to issue the arrest warrant. The inclusion of this evidence in the affidavit, therefore, would not have been determinative on the issue of probable cause. *See Freeman,* 163 F.Supp.2d at 486 (noting that the judge would not necessarily want or need to know that plaintiff denied committing the crime to determine whether there was probable cause to arrest).

### b. Misrepresentations

■ Second, plaintiff attempts to attack the validity of the arrest warrant by alleging that Det. Lt. Higgins made an affirmative misrepresentation in the affidavit he submitted to Judge Erickson. Specifically, plaintiff claims that Det. Lt. Higgins inaccurately stated in his affidavit that "Karim told Toni that if she wrote the wrong thing that he would have a problem with her *which she knew to mean that she would be fired."* Pl.'s Mem. Law Supp. Objection to Def.'s Mot. Summ. J. at 18. Plaintiff argues that nowhere in the statements furnished by Raimondo on either August 3, 1999 or August 4, 1999, did Raimondo state that she *knew* she would be fired. Rather, in her August 3, 1999 written statement Raimondo told the police that she *assumed* or *thought* that she would be fired if she did not comply with plaintiff's request. This misrepresentation, according to plaintiff, is crucial to the finding of probable cause in his case.

■ "An assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his [or her] statements or had obvious reasons to doubt the accuracy of the information he [or she] reported.'" *Wilson,* 212 F.3d at 788 (citation omitted). Importantly, courts define the reckless disregard standard as requiring the law enforcement officer to

have a "high degree of awareness of the statements' probable falsity." *Id.* (citing *Lippay v. Christos,* 996 F.2d 1490, 1501 (3d Cir.1993)). Awareness of the falsity of a statement, however, is not enough to defeat a probable cause determination. Importantly, the assertion must be material to the finding of probable cause. *Wilson,* 212 F.3d at 789; *see also United States v. Rivera,* 750 F.Supp. 614, 617 (S.D.N.Y.1990)("As an initial matter, challenged statements from an affidavit in support of an arrest must be material.").

■ The Third Circuit's decision in *Wilson v. Russo,* 212 F.3d 781 (3d Cir. 2000) sets forth the standard for determining the materiality of a misstatement. To determine the materiality of a misstatement, courts must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Wilson,* 212 F.3d at 789. If the corrected affidavit establishes probable cause to arrest, summary judgment must be granted in favor of defendants, for even if there had been no misrepresentations in the affidavit reviewed by a judge, the suspect would have been arrested. *See id.*

Here, the misrepresentation that plaintiff complains of was not material to Judge Erickson's finding of probable cause. In the context of ascertaining what Raimondo's subjective belief was regarding the stability of her job had she refused plaintiff's request to write the statement, and reading Det. Lt. Higgins' affidavit in its entirety, the Court finds that the distinction between "knowing," "assuming," and "thinking" she would be terminated is minimal at best. *See, e.g., United States v. Beasley,* 550 F.2d 261, 267 (5th Cir.1977) (noting that whether the witness "knew" rather than "thought" his $1,000 a month payments came from defendant, is an in-

significant slight change in terminology). Accordingly, given the inconsequential difference in the meaning of the words "knew," "thought," and "assumed," the inclusion of the correct statement in the affidavit does not diminish the existence of probable cause to arrest plaintiff for violating § 11–42–2.

 As discussed above, to be eligible for the protective shield of qualified immunity, an officer must have held a reasonable belief as to probable cause. *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). In this case, the Court concludes that Det. Lt. Higgins acted reasonably both in conducting his criminal investigation of plaintiff and in his preparation of the affidavit in support of the application for the arrest warrant. Accordingly, defendants have satisfied the requirements of qualified immunity, and therefore, are shielded from liability against plaintiff's § 1983, false arrest, abuse of process, and malicious prosecution claims. *See Beaudoin v. Levesque,* 697 A.2d 1065, 1068 (1997) (stating that the accumulated facts warranted a reasonably prudent person's belief that a crime had been committed, and thus probable cause to arrest existed and precluded plaintiff's claims for false arrest and malicious prosecution).

## C. Plaintiff's § 1983 Claims

There is an additional reason for granting defendants' motion for summary judgment on the § 1983 claims: plaintiff has failed to show a right to recovery under § 1983. 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To establish a cause of action under § 1983, therefore, a plaintiff must allege: (1) the violation of a right protected by the Constitution or laws of the United States, and (2) that the defendant was acting under color of law. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). In this case, it is undisputed that Det. Lt. Higgins was acting under color of state law. Thus, in order for plaintiff to prevail on the merits of his § 1983 claims, he must show that Det. Lt. Higgins violated a right secured to him under the Constitution. Given the above analysis, this Court concludes that plaintiff has not demonstrated any constitutional violation.

 Generally, "the determination of a qualified immunity claim is 'independent of the merit of the underlying constitutional claim.'" *Cookish v. Powell,* 945 F.2d 441, 443 (1st Cir.1991) (citation omitted). The Supreme Court has instructed courts to separate the qualified immunity analysis from the § 1983 merits analysis because the qualified immunity analysis does not address the substantive viability of the underlying constitutional claim. *See Amsden v. Moran,* 904 F.2d 748, 751 (1st Cir. 1990). Rather, as noted previously, under the qualified immunity analysis courts must focus on the objective reasonableness of the defendant's actions. *See id.* Thus, in cases where a defendant claims the protection of qualified immunity, the merits of a plaintiff's constitutional claim may never be reached because courts are instructed to first decide the issue of the applicability of qualified immunity. *See St. Hilaire,* 885 F.Supp. at 354 (noting that the qualified immunity claims must be re-

solved at the earliest possible date after suit is commenced); *Ensey,* 727 A.2d at 691 (same).

There are certain cases, however, that fall within the exception to the general rule. In those cases, the merits of the plaintiff's constitutional claim are " 'inextricably linked' with the issue of qualified immunity" *Morales v. Ramirez,* 906 F.2d 784, 787 (1st Cir.1990)(citing *Unwin v. Campbell,* 863 F.2d 124, 133 n. 9 (1st Cir. 1988)), such that the qualified immunity analysis unavoidably calls into question whether any constitutional violation occurred. *Id.; see also Camilo-Robles v. Hoyos,* 151 F.3d 1, 7–8 (1st Cir.1998) (noting that in some cases, the qualified immunity and merit inquiries overlap). This is one of those cases.

■ Here, plaintiff alleges that Det. Lt. Higgins unlawfully arrested him in violation of his Due Process Rights as guaranteed to him under the Constitution. This Court finds plaintiff's argument devoid of merit. As has already been demonstrated, Det. Lt. Higgins not only had probable cause to arrest plaintiff but he also had presented an application for an arrest warrant to a judicial officer, who after reviewing the application, issued a valid arrest warrant. Plaintiff, furthermore, was arraigned and released on his personal recognizance the very same day that he was arrested. Thus, the amount of time he was actually detained was minimal at best. Based on the foregoing, this Court concludes that plaintiff has not been deprived his liberty without due process of law. In other words, this Court's finding of probable cause to arrest plaintiff vitiates plaintiff's false arrest and malicious prosecution claims, and therefore, there was no constitutional violation. *See, e.g., Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 254 (1st Cir.1996) ("[I]f probable cause to arrest and prosecute the [plain-

tiff] exists, no unconstitutional deprivation occurred."). Accordingly, plaintiff has no viable cause of action under § 1983 because the undisputed facts establish that he received all the process he was due.

## D. The Remaining State Law Claims

■ This Court declines to exercise jurisdiction over plaintiff's remaining state law claims for defamation, negligent supervision, and negligent hiring. The Court can only consider state law claims under the doctrine of supplemental jurisdiction. 28 U.S.C. § 1367(a) provides that "in any civil action of which the district courts shall have supplemental jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action . . . that they form part of the same case or controversy". *Id.* This Court has the power to hear both state and federal claims if they would ordinarily be tried in one judicial proceeding. *See Penobscot Indian Nation v. Key Bank of Maine,* 112 F.3d 538, 563–64 (1st Cir.1997). In particular, "[t]he state and federal claims must derive from a common nucleus of operative fact". *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The exercise of supplemental jurisdiction, however, is discretionary, and the district court should "take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 257 (1st Cir.1996).

The statute granting the district courts supplemental jurisdiction explicitly states that a court may decline to exercise its discretion if it has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c); *Penobscot,* 112 F.3d at 564. The United States Supreme Court has stated that when all federal claims are eliminated from the case before trial, in

the usual case the balance of factors to be considered should lead the court to conclude that the "state claims should be dismissed as well." *Gibbs,* 383 U.S. at 726, 86 S.Ct. 1130.

█ In the present case, no federal claims remain, leaving the only questions of law arising under Rhode Island state law. Under these circumstances, this Court declines the opportunity to interpret state law in a matter devoid of federal interest. Accordingly, the Court will not exercise jurisdiction over plaintiff's state law claims.

IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted as to Counts I, II, III, and IV of the Complaint. The Court, however, declines to exercise supplemental jurisdiction over the remaining state law claims, Counts V, VI, and VII, and dismisses those claims without prejudice.

The Clerk shall enter judgment for defendants to that effect, forthwith.

It is so ordered.