Frank **FRAIOLI, Jr., D.O.;** Louise Fraioli, Plaintiffs,

v.

Alfred M. **LEMCKE, III;** John Hancock Life Insurance Company; Signator Investors, Inc.; Boston Partners Insurance; The Mony Group, Inc.; Mony Securities Corp.; MML Investors Services, Inc, Defendants.

**C.A. No. 02–263L.**

United States District Court, D. Rhode Island.

Aug. 4, 2004.

Todd D. White, Esq., Linda A. Mayer, Esq., Adler Pollock & Sheehan, Providence, RI, for Plaintiff.

Darlene K. Alt, Esq., Stephen M. Prignano, Esq., Edwards & Angell, William F. White, Esq., Dorothea R. Calvano, Esq., White & Galamaga, P.C., CharCretia C. DiBartolo, Esq., Cetrulo & Capone LLP, Ian C. Ridlon, Esq., Randall L. Souza, Esq., Nixon Peabody LLP, Providence, RI, for Defendant.

## *DECISION AND ORDER*

LAGUEUX, Senior District Judge.

This matter arises out of a private scheme devised and implemented by Defendant, Alfred M. Lemcke, III, ("Lemcke") whereby Lemcke defrauded Plaintiffs, Frank Fraioli, Jr., D.O. and Louise Frailoi, ("Plaintiffs") out of approximately $1,200,000.00. At various times between 1993 and 2001, Lemcke provided Plaintiffs with insurance and investment advice while he was affiliated with Defendants, John Hancock Life Insurance Company, ("John Hancock") Signator Investors, Inc., ("Signator") Boston Partners Insurance, ("Boston Partners")[1] the Mony Group, Inc. and Mony Securities Corporation, ("the Mony Defendants") and MML Investors Services, Inc., ("MML")(hereinafter, referred to collectively as "the institutional Defendants"). In early 1996, Lemcke introduced Plaintiffs to the Individual Investors Portfolio Design Company, ("I[2]") a fabricated investment company of Lemcke's own creation which, unknown to Plaintiffs, Lemcke would use to divert Plaintiffs' money to his personal use.

Plaintiffs filed a seven count Verified Amended Complaint against Lemcke and the institutional Defendants. The factual basis for each count asserted against the institutional Defendants is essentially the same. Plaintiffs allege that the institutional Defendants' failure to investigate Lemcke's background and adequately supervise his work allowed Lemcke to defraud Plaintiffs and embezzle their funds. Count I presents a claim for negligent supervision, i.e., that the institutional Defendants each failed to properly investigate Lemcke's background and supervise his work. In Count II, Plaintiffs allege that each Defendant owed and breached a fiduciary duty while Lemcke was providing Plaintiffs with insurance and investment services in his capacity as an agent, representative, and/or associated person of each Defendant. Count III presents a claim for fraud and misrepresentation against each

---

1. Whether or not Lemcke was ever affiliated with Boston Partners is at issue with regard to the present motions.

Defendant. Plaintiffs allege that by allowing Lemcke to act as an agent, registered representative, and/or associated person, the institutional Defendants directly or indirectly misrepresented Lemcke's qualifications to serve as Plaintiffs' insurance and investment advisor and allowed Lemcke to defraud Plaintiffs and embezzle their money. Count IV alleges respondeat superior liability: that the institutional Defendants were Lemcke's supervisors, masters, and/or employers at various times relevant to this litigation and failed to undertake proper supervisory measures to ensure that Lemcke was not defrauding Plaintiffs or misrepresenting the services he was providing. Count V presents a claim for violations of the Securities Exchange Act, 15 U.S.C.A. § 78T(a)(1934), ("Securities Act").[2] Plaintiffs allege that each institutional Defendant directly or indirectly controlled Lemcke and induced him, through improper supervision, to illegally convert Plaintiffs' assets in violation of the Securities Act and the Rules and Regulations of the National Association of Securities Dealers ("NASD"). Count VI alleges that each institutional Defendant violated the Investment Advisors Act, 15 U.S.C.A. § 80b–6 (1940), by not properly investigating Lemcke's background and supervising his work and by allowing Lemcke to employ a scheme to defraud Plaintiffs using various instrumentalities of interstate commerce. Finally, Count VII presents a claim for violations of the Rhode Island Uniform Securities Act, R.I. Gen. Laws § 7–11–501 (1990).[3] Plaintiffs seek remuneration of all funds embezzled due to Defendants' actions, including tax liabilities and penalties, interest, costs, attorneys' fees, and other fees assessed by this Court. Plaintiffs allege jurisdiction under 28 U.S.C. § 1331 and pursuant to diversity of citizenship.

This matter is before the Court on three separate motions for summary judgment on all counts presented by the Mony Defendants, MML, and Boston Partners. There is also a motion by Plaintiffs to file a Second Amended Verified Complaint, which adds counts alleging apparent authority against the institutional Defendants (Count VII), joint and several liability against the institutional Defendants (Count VIII), conversion against Lemcke (Count IX), and successor liability against Boston Partners (Count X).

For the reasons that follow, this Court is persuaded by the arguments presented by the Mony Defendants, MML, and Boston Partners and grants summary judgment to those entities on all of Plaintiffs' claims. Plaintiffs' Motion to File a Second Amended Verified Complaint is granted in part and denied in part. The motion to amend to add causes of action against the Mony Defendants, MML, and Boston Partners is denied because Plaintiffs fail to state any claim upon which relief could be granted as to those Defendants. This Court grants Plaintiffs' motion to amend to add their proposed Count VII for apparent authority against John Hancock and Signator and Count IX for conversion against Lemcke. Plaintiffs' motion to add their proposed Count VIII for joint and several liability against each institutional Defendant and Count X for successor liability against Boston Partners is denied.

## I. Background and Procedural History

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the

---

**2.** Although the Amended Complaint does not so specify, this Court assumes that Plaintiffs assert Count V against the institutional Defendants.

**3.** Since Plaintiffs do not specify, this Court assumes that Count VII is also asserted against the institutional Defendants.

nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.,* 133 F.3d 103, 106 (1st Cir.1997). Viewing the evidence in that manner, the facts in this case are as follows:

This case arises out of a long-standing friendship between Plaintiffs and Lemcke. Plaintiffs, Dr. and Mrs. Fraioli, are residents of Smithfield, Rhode Island. Defendant, Alfred M. Lemcke, III, was a resident of Hingham, Massachusetts at all times relevant to this litigation. Lemcke attended the Berklee College of Music where he met and befriended Louise Fraioli's brother, Michael Verville ("Verville").

Dr. and Mrs. Fraioli married on September 3, 1988. Shortly thereafter, Dr. Fraioli opened an osteopathic medical practice in Smithfield, Rhode Island. Dr. Fraioli met Lemcke in 1989 or 1990 at a wedding in Portland, Maine. At some point in 1993, Verville contacted his sister and explained that Lemcke had become an insurance agent and wanted to speak with Dr. Fraioli about his insurance needs.

After several meetings, the Fraiolis decided to purchase insurance products from Lemcke and to deal with him exclusively for all of their insurance needs. Dr. Fraioli and Lemcke's business relationship became more personal as Dr. Fraioli began to consider Lemcke a personal and financial confidant and later, one of his best friends. This close friendship made Dr. Fraioli feel comfortable going to Lemcke for investment and financial advice and services.

Lemcke was employed by the Mony Defendants when he first provided the Fraiolis with financial services in 1993. The Mony Defendants consist of a corporation, the Mony Group, Inc., and a securities broker-dealer, Mony Securities, who had places of business in Waltham, Massachusetts during all time periods relevant to this litigation. Before hiring Lemcke, the Mony Defendants verified the information that Lemcke provided on his application and conducted standard background checks. Between late 1992 and March of 1993, the Mony Defendants trained Lemcke and gave him study materials for the requisite life and health insurance exams. Lemcke did not have any experience in insurance sales or finance before he came to work for the Mony Defendants.

On March 8, 1993, after passing his life and health insurance exams, Lemcke entered into a Career Contract with the Mony Defendants. That contract designated Lemcke as an independent contractor and authorized him to solicit applications for insurance policies that could be issued by the Mony Defendants. On November 3, 1993, Lemcke entered into a Registered Representative Contract with the Mony Defendants, which designated him as an independent contractor and authorized him to sell Mony products including mutual funds, variable annuities, unit investment trusts, limited partnership interests, tax shelter programs, variable life insurance, and other approved products that were sold or distributed by the Mony Defendants.

During his tenure with the Mony Defendants, Lemcke attended routine meetings with his supervisors, Michael Meehan ("Meehan") and Peter MacAvin ("MacAvin"), to discuss his caseload and general level of production. Jeremiah Healey, Jr. ("Healey"), who was a general agent of the Mony Defendants, would then contact Meehan and inquire as to Lemcke's productivity and whether or not there were any problems with his general work performance. Lemcke also attended yearly compliance meetings that were required to maintain his license. The Mony Defendants' policies required Lemcke's supervisors to review his client files on a weekly or monthly basis, depending on the type of file. However, there does not appear to be

any documentation of a review or audit of Lemcke's work performance for 1993, 1994, or 1995.

Throughout the early 1990s and while employed by the Mony Defendants, Lemcke sold Plaintiffs what were called Enterprise Mutual Fund Accounts that Plaintiffs used to save money for their children's college educations. Lemcke also gave Plaintiffs a complete financial analysis and sold them annuities and life and disability insurance policies that were offered by the Mony Defendants. In the summer of 1995, Lemcke told Dr. Fraioli that he was leaving the Mony Defendants and going to work for John Hancock.

Defendants, John Hancock and its subsidiary, Signator, are corporations with places of business in Boston, Massachusetts. They employed Lemcke between August of 1995 and early 2000. John Hancock employed Lemcke to sell its life insurance products and Signator, a securities broker-dealer, employed Lemcke as a registered representative to sell its equity products. During his employment with these entities, Lemcke sold Plaintiffs various John Hancock insurance products.

John Hancock's agencies are internally identified using unofficial names and correspondence numbers such as Boston General Agency ("BGA") or Boston General Agency 103. During 1995, and before Lemcke began working for John Hancock, Healey was the general agent for the John Hancock agency known internally as BGA. At some point during 1997, Healey changed the name of BGA to Hancock Partners. Lemcke resigned from John Hancock in December of 1999 and since then has had no professional relationship with that entity. Healey was the only general agent that Lemcke was affiliated with during his employment with John Hancock.

In early 1996, while employed by John Hancock, Lemcke told Plaintiffs that he was affiliated with a Chicago based company known as the Individual Investors Portfolio Design Company ("$I^2$"). Lemcke told Dr. Fraioli that $I^2$ was an investment program or corporate trust that involved a small number of investors. Lemcke wanted to use $I^2$ to invest Dr. Fraioli's money in stocks and bonds and allow that money to grow tax deferred. Although Dr. Fraioli was unsure as to what exactly $I^2$ was, he had full, complete, one-hundred percent trust in Lemcke and did not feel as though Lemcke would do him any wrong.

Dr. Fraioli told his wife about Lemcke's $I^2$ investment program and the two began investing money, with Lemcke's assistance, in various $I^2$ accounts. Lemcke obtained and had Dr. Fraioli sign surrender forms for the Enterprise accounts that Dr. Fraioli had with the Mony Defendants. Later, Dr. Fraioli received checks representing the proceeds from these accounts. Dr. Fraioli deposited those checks into his personal account and then wrote checks to $I^2$. This process continued virtually uninterrupted from its inception in 1996 until the fall of 2001. Dr. Fraioli received all of the money from his Enterprise accounts and continuously used that money to write checks to $I^2$. Dr. Fraioli also cashed in several Mony and John Hancock life insurance policies and mutual funds and invested that money in $I^2$.

Dr. Fraioli routinely handed Lemcke checks in amounts ranging from $1,000.00 to $50,000.00 made payable to Lemcke, "Lemcke and Associates," or whomever Lemcke requested. Lemcke often came to Dr. Fraioli's office when Dr. Fraioli was very busy, saw him for about thirty seconds, and asked Dr. Fraioli to endorse a check. Dr. Fraioli never thought twice about following Lemcke's directions, even though, on one occasion, Lemcke instructed him to endorse a check that was made out to Mrs. Fraioli. Dr. Fraioli thought

that his money was going into various financial accounts, including a retirement account for Mrs. Fraioli.

Dr. Fraioli had never purchased stock prior to 1996 when he began investing in $I^2$, but the fact that Lemcke worked for John Hancock made Dr. Fraioli feel comfortable and secure. While Dr. Fraioli did not know the exact relationship between $I^2$ and John Hancock, he knew that Lemcke was a registered representative of John Hancock and thought that $I^2$ was a product endorsed by John Hancock. On one occasion, Dr. Fraioli received correspondence regarding $I^2$, which came in a John Hancock envelope that was marked with a Boston address. Lemcke never told Dr. Fraioli that $I^2$ was a separate entity from John Hancock.

All of Dr. Fraioli's contact with $I^2$ was through Lemcke. Lemcke told Dr. Fraioli that he was a licensed stockbroker and never gave Dr. Fraioli a reason to believe any different. Lemcke personally delivered Dr. Fraioli a statement regarding his $I^2$ accounts about every six months. These statements did not contain an $I^2$ phone number or address for contact purposes, an account number, or any indication that Lemcke was involved with or was the broker on the account. Dr. Fraioli repeatedly asked Lemcke to verify that his investments were tax deferred and Lemcke always assured Dr. Fraioli that he was not incurring any tax liabilities on the $I^2$ accounts and could invest an unlimited amount of money in $I^2$. Dr. Fraioli never tried to telephone any $I^2$ office, call directory assistance, fill out an application for his $I^2$ investments, or see a prospectus for or any literature regarding $I^2$. Yet, Dr. Fraioli invested roughly $1 million in $I^2$, drawing this money from his Enterprise and separate business accounts. When Mrs. Fraioli noticed that her husband was taking money from their children's college funds, Dr. Fraioli assured her that

Lemcke had given him a good reason for doing so.

Lemcke constantly assured Dr. Fraioli that his $I^2$ accounts were doing well. When the stock market declined in 1999 and 2000, Lemcke told Dr. Fraioli that although he was not making any money on his investments, things were staying the same. Dr. Fraioli continued investing in $I^2$, trusting Lemcke to do what was right and having no reason to think that what Lemcke was telling him was untrue.

In the beginning of 1999, Lemcke began to assume responsibilities for Dr. Fraioli that went beyond making his investments. Lemcke set up an interest-bearing tax account in which Dr. Fraioli would deposit money that Lemcke said he would use to pay Dr. Fraioli's quarterly income taxes and to make the required contributions to Dr. Fraioli's pension fund. Dr. Fraioli never saw any paperwork for this account but did receive xeroxed copies of four checks, which Lemcke had supposedly sent to the Internal Revenue Service ("IRS") for Dr. Fraioli's taxes. On occasion, Lemcke asked for and received Dr. Fraioli's authorization to withdraw cash from Dr. Fraioli's pension fund. Lemcke said he was placing that money in a vehicle that would yield a higher return.

At some point prior to September of 2001, without Dr. Fraioli's authorization, Lemcke tried to represent himself as Dr. Fraioli and withdraw cash from Dr. Fraioli's pension plan. Dr. Fraioli confronted Lemcke about this incident and expressed his dissatisfaction with Lemcke's conduct. Lemcke assured Dr. Fraioli that this conduct would not be repeated and Dr. Fraioli indicated that despite this incident, he still trusted Lemcke.

Dr. Fraioli and his wife divorced in May of 1999. As part of the divorce settlement, their $I^2$ account was split into two, one account for each spouse, and each account

having approximately $210,000.00. Dr. Fraioli also agreed to contribute $2,000.00 a month to Mrs. Fraioli's $I^2$ account. Lemcke advised the Fraiolis to make additional investments through him, which included surrendering insurance policies and redeeming savings bonds and accounts that the Fraiolis had established for their minor children. Mrs. Fraioli was unaware that her husband had taken loans against these life insurance policies and had surrendered some of the policies on her and her children in order to invest more money in $I^2$.

In July of 2000, Lemcke informed Dr. Fraioli that he was leaving John Hancock and opening his own office called "Lemcke and Associates" in Hingham, Massachusetts. In reality, Lemcke had commenced employment with MML on or about June 6, 2000. MML is a securities broker-dealer with a place of business in Springfield, Massachusetts. Similar to the Mony Defendants, MML contracts with individuals who are registered with the National Association of Securities Dealers ("NASD") and those individuals serve as independent contractors who are licensed to sell MML investment products.

Dr. and Mrs. Fraioli have never had any affiliation with MML. They did not open accounts with MML, purchase any MML products, or visit any of MML's offices. Dr. Fraioli knew that $I^2$ was not an MML product and never wrote a check to MML. Mrs. Fraioli did not know that Lemcke was a registered representative of or had any affiliation with MML. Lemcke kept the Fraiolis' file at his Hingham office and listed it as his personal business rather than as an MML file.

The Fraiolis continued investing their money in $I^2$ at Lemcke's direction until 2001, when they began to realize that their trust in Lemcke had been entirely misplaced. In March of 2001, Mrs. Fraioli asked Lemcke to roll over certain IRAs

issued by the Mony Defendants into her name as required by her divorce settlement with Dr. Fraioli. However, Lemcke never complied with this request because, as Dr. Fraioli later told his ex-wife, he had cashed out those IRAs and invested that money in $I^2$. In early September of 2001, Mrs. Fraioli realized that Lemcke was avoiding her and not following through on his promises to deliver statements regarding the $I^2$ accounts. Unhappy with Lemcke and tired of his delays, Mrs. Fraioli told Lemcke and her ex-husband that she wanted to transfer her account to Paine Webber. Lemcke said that this was impossible because her money was in a tax-sheltered investment and she could not withdraw it without incurring a substantial penalty. When Mrs. Fraioli pressed Lemcke for a full accounting, he told her that this too was impossible because her records were lost in the destruction of the World Trade Center on September 11, 2001. Mrs. Fraioli did not believe Lemcke because every time he spoke of $I^2$, he had said that it was based in Chicago. Lemcke was unable to transfer the requested monies to Mrs. Fraioli and was forced to admit that all of her money was gone. Lemcke later told Dr. Fraioli that all of the money that the Fraiolis had invested in the $I^2$ accounts was gone.

The Securities and Exchange Commission ("SEC") filed a complaint against Lemcke, froze his assets, and conducted an investigation that revealed that: 1) "Lemcke & Associates," the entity under which Lemcke was doing business, was never registered with the SEC and may not have ever actually existed; 2) $I^2$ never existed; 3) Lemcke lacked some of the requisite licenses to conduct the business he was doing; and 4) all of the money that Dr. and Mrs. Fraioli had given Lemcke to invest in $I^2$ was gone. Lemcke had never transferred about $30,000.00 into Dr. Fraioli's pension fund or made Dr. Fraioli's

quarterly income tax payments as promised. Instead, Lemcke embezzled that money, as he had done with all of the money that the Fraiolis thought they were investing in I [2]. Lemcke fabricated the checks that he gave Dr. Fraioli to show his income tax payments and never sent those checks to the IRS. As a result, Dr. Fraioli is still liable for those taxes and the accrued penalties. Between 1993 and 2001, Lemcke defrauded Plaintiffs of approximately $1,200,000.00 and used that money to build and support a lavish lifestyle.

On June 5, 2002, Plaintiffs filed a Complaint with this Court, which each institutional Defendant subsequently answered. On September 3, 2002, the Clerk entered a default against Lemcke. Plaintiffs later moved for a final default judgment against Lemcke and the institutional Defendants objected. On May 23, 2003, Plaintiffs made a motion to amend the Complaint and add Defendant, Boston Partners, which this writer granted on June 11, 2003. Plaintiffs filed a Verified Amended Complaint the next day, which each Defendant, except Lemcke, later answered.

Plaintiffs then moved to file a Second Amended Verified Complaint and, in early September of 2003, the Mony Defendants and MML filed separate motions for summary judgment. Defendants, John Hancock and Signator, objected to these motions but did not file their own motion for summary judgment. On October 22, 2003, this Court held a hearing on the Mony Defendants' and MML's motions for summary judgment and Plaintiffs' Motion to File a Second Amended Verified Complaint and took those matters under advisement. On February 3, 2004, Boston Partners filed a motion for summary judgment, which was argued before this writer and taken under advisement on April 10, 2004. The motions of the Mony Defendants, MML, and Boston Partners for summary judgment and Plaintiffs' Motion to File a Second Amended Verified Complaint have been fully briefed and argued and are now in order for decision.

## II. Standards for Decision

### Motions for Summary Judgment

The Mony Defendants, MML, and Boston Partners have moved for summary judgment on all counts asserted against them under Rule 56(c) of the Federal Rules of Civil Procedure, which sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The critical inquiry is whether a genuine issue of material fact exists. *Menebhi v. Mattos,* 183 F.Supp.2d 490, 498 (D.R.I.2002). "Material facts are those 'that might affect the outcome of the suit under the governing law.'" *Morrissey v. Boston Five Cents Sav. Bank,* 54 F.3d 27, 31 (1st Cir.1995)(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). There is a genuine dispute over a material fact when the evidence is such that a reasonable jury could find for the nonmoving party. *Id.*

In determining whether summary judgment is appropriate, the Court must view the facts in the record and all inferences therefrom in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.,* 133 F.3d 103, 106 (1st Cir.1997). Where the facts support plausible yet conflicting inferences on a central issue in the case, the Court may not choose between such inferences on a motion for summary judg-

ment. *Menebhi,* 183 F.Supp.2d at 498 (citing *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir.1995)). Summary judgment "is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.,* 777 F.Supp. 167, 169 (D.R.I.1991). At the summary judgment stage, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood." *Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987). Summary judgement is only available when there is no dispute as to any material fact and only questions of law remain. *See Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996). The moving party bears the burden of showing that no evidence exists to support the nonmoving party's position. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Rochester Ford Sales, Inc. v. Ford Motor Co.,* 287 F.3d 32, 38 (1st Cir.2002).

### *Motion to Amend the Complaint*

Rule 15(a) of the Federal Rules of Civil Procedure permits a litigant to file an amended pleading once as a matter of right before a responsive pleading is filed and thereafter, with the parties' consent or leave of the court. *Harvey v. Snow,* 281 F.Supp.2d 376, 379 (D.R.I.2003). While leave to amend is to be freely granted as justice requires, the Rule does not require that a court carry a rubber stamp. *Almeida v. United Steelworkers of Am. Int'l Union,* 50 F.Supp.2d 115, 120 (D.R.I.1999)(citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)). *See also Harvey,* 281 F.Supp.2d at 379; Fed.R.Civ.P. 15(a)(West 2004). A court may deny a motion to amend when the proposed amendments are futile, cause the

opposing party unfair prejudice or undue delay, or are proposed in bad faith. *Almeida,* 50 F.Supp.2d at 120. *See also Hatch v. Dep't. for Children, Youth & Their Families,* 274 F.3d 12, 19 (1st Cir. 2001); *Maldonado v. Dominguez,* 137 F.3d 1, 11 (1st Cir.1998); *Cummins v. EG & G Sealol, Inc.,* 690 F.Supp. 134, 135 (D.R.I.1988)(citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

When a plaintiff files for leave to amend after the close of discovery and while a motion for summary judgment is pending, the proposed amendments must be both theoretically viable and solidly grounded in the record. *Harvey,* 281 F.Supp.2d at 381(quoting *Hatch,* 274 F.3d at 19). In this situation, a proposed amendment is futile unless the allegations therein are supported by substantial evidence. *Id.* In order to determine whether or not an amendment would be futile, the district court applies the same legal standard that it applies to a motion brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Almeida,* 50 F.Supp.2d at 120. *See also Harvey,* 281 F.Supp.2d at 381(citing *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.1996)). Thus, an amendment is futile when the complaint, as amended, would fail to state a claim upon which relief could be granted. *Id.*(citing *Glassman,* 90 F.3d at 623).

### III. Discussion

■ The Amended Complaint alleges that this Court has federal question jurisdiction, under 28 U.S.C. § 1331, over Count V (Securities Exchange Act of 1934) and Count VI (Investment Advisors Act of 1940). This Court has jurisdiction over the remaining state law claims based on the parties' diversity of citizenship. 28 U.S.C. § 1332(a)(1). Federal courts sitting in diversity must apply the substan-

tive law of the forum state. *Erie R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Therefore, this Court will resolve the present motions as they pertain to the state common law claims by applying Rhode Island law and, where appropriate, persuasive adjudications by courts of sister states and considerations of public policy as identified in state decisional law. *Norton v. Hoyt,* 278 F.Supp.2d 214, 219 (D.R.I. 2003).

The Mony Defendants, MML, and Boston Partners have moved for summary judgment and argued that there are no genuine issues of material fact and judgment should be entered in their favor on all counts asserted against them in the Amended Complaint. Defendants, John Hancock and Signator did not file a motion for summary judgment but objected to the motions of the Mony Defendants and MML.[4] Plaintiffs oppose these motions and argue that issues of fact exist regarding each Defendant and each count of the Amended Complaint. In addition, Plaintiffs move to file a Second Amended Verified Complaint adding counts for apparent authority and joint and several liability against the institutional Defendants, successor liability against Boston Partners, and conversion against Lemcke. This Court will address each motion in turn.

***The Mony Defendants' and MML's Motions for Summary Judgment***

■ The Mony Defendants move for summary judgment on all counts asserted

against them in Plaintiffs' Amended Complaint. It is undisputed that there is no evidence indicating that Lemcke embezzled funds from Plaintiffs while he was an agent or representative of the Mony Defendants. *See Mem. of Law in Supp. of Defs.' The Mony Group & Mony Secs. Corp's. Mot. for Summ. J.,* (hereinafter, *Mony Mem.*), at 2; *Pls.' Opp'n. to Defs.' The Mony Group, Inc.'s & Mony Secs. Corp.'s Mot. for Summ. J.,* (hereinafter, *Pls.' Opp'n. to Mony Defs.*), at 6. However, Plaintiffs argue that there are material issues of fact regarding the continuation of Lemcke's apparent authority and the Mony Defendants' alleged negligent hiring and supervision of Lemcke, which they maintain allowed Lemcke to lay the foundation for his fraudulent scheme. *Pls.' Opp'n. to Mony Defs.,* at 6–8.

MML also moves for summary judgment on all counts. MML argues that the undisputed evidence reveals that Plaintiffs were not MML customers and that their losses were the result of Lemcke's criminal activities that were beyond the scope of MML's business. *Mem. in Supp. of MML Investors Servs. Inc.'s Mot. for Summ. J.,* (hereinafter, *MML Mem.*) at 1. Plaintiffs assert that the fact that Lemcke embezzled over $150,000.00 while he was an MML representative raises issues of material fact as to whether or not MML was negligent in hiring and/or supervising Lemcke and indirectly induced him to violate the 1934 Securities Act. *Pls.' Opp'n. to*

---

**4.** This Court will disregard John Hancock's objection to the Mony Defendants' and MML's motions for summary judgment because John Hancock does not appear to have standing to make that objection. *See Blonder v. Casco Inn Residential Care Inc.,* No. 99–274, 2000 WL 761895, at *1 (D.Me. May 4, 2000)(disregarding a co-defendant's opposition to another co-defendant's motion for summary judgment absent cross claims). The Federal Rules of Civil Procedure permit an adverse party to submit his or her opposition to a motion for

summary judgment. Fed.R.Civ.P. 56(c). However, since none of the defendants in this case have filed cross claims against each other, the defendants are not adverse parties who are entitled to object to each others' motions for summary judgment. Alternatively, John Hancock supports its objections with *John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48 (2d Cir.2001), which dealt with whether certain investors' claims could be arbitrated under the NASD rules and has no pertinence to the issues before this Court.

*Mot. for Summ. J. of Def. MML Investors, Inc.,* (hereinafter, *Pls.' Opp'n. to MML* ) at 6–7. Viewing the evidence in the light most favorable to Plaintiffs, this Court will consider whether or not there are triable issues of fact regarding each count alleged against the Mony Defendants and MML.

### Count I: Negligent Hiring and Negligent Supervision

A court's analysis of any negligence claim begins with the identification of a legal duty owed by the defendant to the plaintiff to avoid acting in a manner that might harm the plaintiff in a tangible way. *Liu v. Striuli,* 36 F.Supp.2d 452, 466 (D.R.I.1999); *Rodrigues v. Miriam Hosp.,* 623 A.2d 456, 460 (R.I.1993)(quoting *Welsh Mfg. Div. of Textron Inc. v. Pinkerton's Inc.,* 474 A.2d 436, 440 (R.I.1984)). *See also, Ryan v. State Dep't. of Transp.,* 420 A.2d 841, 843 (R.I.1980)(noting that the law of negligence does not impose liability on an individual unless there is a breach of a duty owed to the plaintiff); *Leonard v. Bartle,* 48 R.I. 101, 135 A. 853, 854 (1927)(noting that the test for negligence is the measure of the defendant's duty in the circumstances of the particular case). This duty goes to the very existence of liability such that one cannot logically be held liable for the breach of a nonexistent duty. *Swajian v. Gen. Motors Corp.,* 559 A.2d 1041, 1046 (R.I.1989). This duty arises when the risk of injury to another is reasonably foreseeable, *Liu,* 36 F.Supp.2d at 466 (citing *Builders Specialty Co. v. Goulet,* 639 A.2d 59, 60 (R.I.1994)); *Palsgraf v. Long Island R.R.,* 248 N.Y. 339, 162 N.E. 99, 100 (1928)(Cardozo, C.J.), or from a special relationship between a plaintiff and defendant. *Welsh Mfg.,* 474 A.2d at 440(duty created by contract). *See also, Leonard,* 135 A. at 854(citing *Moulton v. Phillips,* 10 R.I. 218, 219 (1872)(duty of a carrier of goods for hire); *Judge v. Narragansett Elec. Lighting Co.,* 21 R.I. 128, 42 A. 507, 508 (1899)(duty of an employee to an employer); *Boss v. Prov. &*

*W.R. Co.,* 15 R.I. 149, 1 A. 9, 11 (1885)(duty of a common carrier to its passengers)). The existence and extent of a duty of care are questions of law for the court to decide. *Rodrigues,* 623 A.2d at 461 (citing *Palmisciano v. Burrillville Racing Ass'n,* 603 A.2d 317, 320 (R.I. 1992)); *Mignone v. Fieldcrest Mills,* 556 A.2d 35, 37 (R.I.1989); *Banks v. Bowen's Landing Corp.,* 522 A.2d 1222, 1224 (R.I. 1987). Once this duty is established, a plaintiff must show that the defendant breached that duty and that such breach factually and legally caused the plaintiff to suffer a demonstrable loss. *Liu,* 36 F.Supp.2d at 466(citing *Splendorio v. Bilray Demolition Co.,* 682 A.2d 461, 466 (R.I.1996)); W. Page Keeton, et al., *Prosser & Keeton on The Law of Torts,* § 30, at 164–5 (5th ed.1984).

An employer's liability for negligent hiring is based on a failure to exercise reasonable care, by selecting a person who the employer knew or should have known was unfit or incompetent for the work assigned, and thereby, exposing third parties to an unreasonable risk of harm. *See Welsh Mfg.,* 474 A.2d at 440. Thus, an employer has a duty to protect those who may be reasonably expected to come into contact with his employees from harms inflicted by the employer's workers. *Liu,* 36 F.Supp.2d at 467(citing *Welsh Mfg.,* 474 A.2d at 440). This duty lasts for the duration of the employee's tenure with the employer. *Id.*

The extent of an employer's duty to supervise is defined by the nature of the job to which the employee is assigned. *See Welsh Mfg.,* 474 A.2d at 441. In *Welsh Mfg.,* a young and inexperienced employee was given the task of guarding large quantities of gold for his employer's client. 474 A.2d at 438. When the gold was stolen on the employee's watch, the Rhode Island Supreme Court held that the

employer had breached a duty to his client by failing to prepare and supervise the employee for the task to which he was assigned. *Id.* at 443. *See also, Liu,* 36 F.Supp.2d at 467–68(discussing *Welsh Mfg.*). As in a claim for negligent hiring, this duty to supervise lasts for the duration of the employee's tenure with the employer. *Liu,* 36 F.Supp.2d at 467(citing *Welsh Mfg.,* 474 A.2d at 441).

*The Mony Defendants did not have a Duty to Protect Plaintiffs from Lemcke's Fraudulent Acts and Alternatively, did not Cause the Harm that Plaintiffs Suffered After Lemcke Ceased Working for the Mony Defendants.*

■ Plaintiffs contend that even if the first deposit into $I^2$ did not occur until after Lemcke left the Mony Defendants, those Defendants' negligent hiring and supervision of Lemcke and the policies and funds he sold enabled Lemcke to lay the foundation for his embezzlement scheme. *Pls.' Opp'n. to Mony Defs.,* at 8. However, any duty by the Mony Defendants to exercise due care in hiring and/or supervising Lemcke lasted for the duration of Lemcke's employment with the Mony Defendants, that being 1992 through 1995. It is undisputed that all of Lemcke's fraudulent activities took place between 1996 and 2001, when Lemcke was no longer employed by the Mony Defendants. *See Mony Mem.,* at 2; *Pls.' Opp'n. To Mony Defs.,* at 6. At that time, the Mony Defendants had no duty to protect Plaintiffs from Lemcke's fraudulent acts. *See Liu,* 36 F.Supp.2d at 467 (citing *Welsh Mfg.,* 474 A.2d at 441).

Plaintiffs argue that the Mony Defendants negligently supervised Lemcke by allowing him to sell Mony insurance policies without a license and by never reviewing Lemcke's customer files. *Pls.' Opp'n. to Mony Defs.,* at 9. Assuming that the Mony Defendants had a duty to protect Plaintiffs from Lemcke, there is no evidence that any alleged act or omission by the Mony Defendants directly or proximately caused the harm that Plaintiffs suffered due to Lemcke's fraudulent activities. Had the Mony Defendants reviewed Plaintiffs' file between 1993 and 1995, they would not have detected the fraudulent scheme that was then nonexistent. Therefore, even assuming that the Mony Defendants had and breached a duty to reasonably prepare and supervise Lemcke, Plaintiffs' negligence claims fail on the third element of causation. Absent a duty owed by the Mony Defendants to Plaintiffs while Lemcke was using $I^2$ to defraud them and/or evidence that the Mony Defendants' acts or omissions caused Plaintiffs harm, there are no issues of material fact regarding Plaintiffs' negligence claims and the Mony Defendants are entitled to summary judgment as a matter of law on Count I of the Amended Complaint.

*MML did not owe Plaintiffs a Duty to Exercise Reasonable Care in Hiring or Supervising Lemcke and Alternatively, did not Directly or Proximately Cause Plaintiffs' Injuries.*

■ Plaintiffs argue that material issues of fact regarding MML's alleged negligence in hiring and supervising Lemcke preclude summary judgment with respect to Count I. Plaintiffs' negligent hiring claim is based on allegations that MML hired Lemcke even though Lemcke lied about his educational background and personal assets on his employment application and MML knew that Lemcke had filed for bankruptcy in the early 1990s. *Pls.' Opp'n. to MML,* at 7–8. Plaintiffs also allege that during the application process, MML did not detect that Lemcke had falsified his past sales record and was terminated by John Hancock for a lack of production. *Id.* Plaintiffs base their negligent supervision claim on MML's alleged

failure to audit Lemcke's job performance as required by MML's Compliance Manual. *Id.*, at 8–9. MML argues that summary judgment is appropriate with respect to Count I because Plaintiffs' allegations assume but do not establish that MML owed Plaintiffs a legal duty with respect to Lemcke's actions. *Reply Mem. of MML Investor Servs. Inc. in Supp. of its Mot. for Summ. J.*, at 1–2.

The situation with respect to MML is analogous to that presented in *Harrison v. Dean Witter Reynolds, Inc.*, which involved a common law claim for negligent hiring after a Dean Witter vice president and his assistant created and used a scheme to defraud numerous investors. 974 F.2d 873, 875–6 (7th Cir.1992). The Seventh Circuit held that Dean Witter did not owe the plaintiff a legal duty because the plaintiff was never a customer of, purchased no securities from, and never had an account with Dean Witter. *Id.* at 885. Therefore, even if Dean Witter was negligent in hiring and retaining its vice president and his assistant, summary judgment was proper because no duty arose under the circumstances presented. *Id.*

In this case, Plaintiffs were not customers of, purchased no securities from, and never held an account at MML. *See, Louise Fraioli Dep.*, at 285; *Aff. of James Furlong*, at para. 3. Dr. Fraioli did not believe that I[2] was an MML product and had no contact with MML while he was involved in his personal and business relationships with Lemcke. *Frank Fraioli Dep.*, at 402 & 406. Like the situation in *Harrison*, even if MML was negligent in hiring and/or supervising Lemcke, there is no relationship, contractual or otherwise, that would create the duty required to hold MML liable for negligence.

Plaintiffs argue that MML had a duty by statute and its Compliance Manual to monitor, audit, supervise, and control Lemcke, his offices, and the files with which he worked. *Pls.' Opp'n to MML*, at 6. Plaintiffs cite Sections 15(b)(4)(E), 17(a), and Rule 10b–5 of the Securities Exchange Act, which require broker-dealers to reasonably supervise their agents and/or registered representatives and two administrative decisions, which held a broker-dealer liable under these provisions. *See id.* at 9–10(citing *Prudential Secs. Inc.*, Securities Exchange Act Release No. 34–48149, *available at*, 2003 WL 21544428 (July 10, 2003); and *Consol. Inv. Servs. Inc.*, Securities Exchange Act Release No. 34–36687, 61 S.E.C. Docket 19, *available at*, 1996 WL 20829 (Jan. 25, 1996)). However, those cases are distinguishable because in those matters, the courts imposed liability under the Securities laws rather than common law negligence. *Id.*

Even if the Securities Laws created a duty to supervise, Rhode Island law requires that Plaintiffs prove that a violation of those provisions was the direct and proximate cause of their injuries, rather than a mere condition or circumstance which contributed to such injuries. *See Clements v. Tashjoin*, 92 R.I. 308, 168 A.2d 472, 475 (1961). Plaintiffs have not shown that MML's alleged failure to supervise Lemcke was a direct and proximate cause of their injuries. Rather, it was the actions of Lemcke and in some instances, Dr. Fraioli that caused Plaintiffs' injuries. Lemcke exploited his close relationship with Dr. Fraioli in order to persuade Plaintiffs to continuously invest their money in his fictitious entity. Dr. Fraioli knew that Lemcke had tried to represent himself as Dr. Fraioli to withdraw money from Dr. Fraioli's pension plan. *Frank Fraioli Dep.*, at 269. Yet, Dr. Fraioli still trusted Lemcke and continued signing his money over to Lemcke to invest in I[2]. *Id.* at 274. Therefore, while MML's alleged failure to supervise Lemcke may have been a condition or circumstance which led to his fraudulent scheme, there is no evidence

that such failure was a direct or proximate cause of Plaintiffs' injuries and is not enough to make any alleged violations of the Securities Laws prima facie evidence of negligence.

Assuming that MML owed Plaintiffs a duty to supervise Lemcke and conduct the reviews and audits provided for in its Compliance Manual, there is no evidence that doing so would have uncovered Lemcke's covert scheme and prevented Plaintiffs' injuries. Lemcke went to great lengths to conceal his I[2] activities from MML by delivering everything with respect to I[2] by hand, answering Plaintiffs' questions in a timely manner, and by never letting anything sit out on the printer that Lemcke shared with other MML insurance agents. *Lemcke Dep.*, at 577. Lemcke never suggested that Dr. Fraioli take money from policies issued by MML and invest it in I[2]. *Id.*, at 295. Rather, Lemcke went directly to Dr. Fraioli and asked for checks, which Dr. Fraioli would write as Lemcke directed. *Id.*

In sum, MML had no relationship with Plaintiffs that would create a duty on MML's part to exercise reasonable care in hiring or supervising Lemcke. Alternatively, Plaintiffs have not presented any evidence to demonstrate that it was MML's breach of duty, and not Lemcke's and Dr. Fraioli's actions, that were the direct and proximate causes of Plaintiffs' injuries. Therefore, MML is entitled to summary judgment as a matter of law with respect to the negligent hiring and supervision claims alleged in Count I.

### Count II: Breach of Fiduciary Duty

■■ In Count II, Plaintiffs allege that the Mony Defendants and MML breached a fiduciary duty by failing to properly investigate Lemcke's background and supervise his work and by allowing him to create and perpetuate his fraudulent scheme. A fiduciary duty arises when the facts show a special relationship of trust and confidence that requires the fiduciary to act in the other party's best interests. *VanWest v. Midland Nat. Life Ins. Co.*, No. 98–76, 2000 WL 34019293, at *3 (D.R.I. Mar.27, 2000). While Rhode Island does not have a *per se* rule that an insurer would never owe a fiduciary duty to an insured, the existence of a fiduciary relationship is limited to the unusual case where the relationship goes far beyond that found in an ordinary business transaction. *Id.* The mere fact that a plaintiff knows and trusts his insurance salesman is not enough to create a fiduciary relationship between those individuals. *Id.*

*The Mony Defendants Engaged in Ordinary Business Transactions with Plaintiffs and thus, did not owe them a Fiduciary Duty.*

■ The facts in this case are sufficient to establish a relationship of trust and confidence between Plaintiffs and Lemcke. Dr. Fraioli described Lemcke as "one of his best friends," *Frank Fraioli Dep.*, at 64, someone in whom he had "full, complete, one-hundred percent trust," *id.* at 65, a "confidant" whom Dr. Fraioli could talk with about everything, *id.* at 232, and one who was looking out for Dr. Fraioli's best interests. *Id.* at 436. While Plaintiffs also had a business relationship with Lemcke in that he was their insurance and investment advisor, that relationship arguably transcended ordinary business when Dr. Fraioli began trusting Lemcke to make his quarterly income tax payments, *see Frank Fraioli Dep.*, at 114–17, payments to his pension fund, *id.* at 265, and to set up a retirement account for his wife when the couple divorced. *Id.* at 247.

However, the focus of this Court's inquiry is on the relationship between Plaintiffs and the Mony Defendants and Plaintiffs and MML. Plaintiffs engaged in ordinary business transactions when they purchased Mony insurance policies from a Mony rep-

resentative. These transactions alone are not enough to create a fiduciary relationship between Plaintiffs and the Mony Defendants. Plaintiffs have not produced any evidence that gives rise to a fiduciary relationship with the Mony Defendants, or presents a question of fact on that issue. As such, the Mony Defendants' motion for summary judgment must be granted as to Count II.

*MML did not do Business and had no Relationship with Plaintiffs that would give rise to a Fiduciary Duty.*

MML is also entitled to summary judgment on Count II because there are no facts that point to a fiduciary relationship between Plaintiffs and MML. There was no business relationship between Plaintiffs and MML, let alone the special relationship of trust and confidence required to give MML a fiduciary duty to act in Plaintiffs' best interests. *See VanWest*, 2000 WL 34019293, at *3; *infra*, at 28–29. Therefore, MML is also entitled to summary judgment as a matter of law with respect to Count II.

### Count III: Fraud/Misrepresentation

A plaintiff must prove three elements to establish a prima facie case for common law fraud in Rhode Island: 1)the defendant made a false representation; 2)the defendant intended to induce the plaintiff to rely on that representation; and 3)the plaintiff justifiably relied on the representation to his or her detriment. *Women's Dev. Corp. v. City of Central Falls*, 764 A.2d 151, 160 (R.I.2001); *Travers v. Spidell*, 682 A.2d 471, 472–73 (R.I. 1996). *See also Nat'l. Credit Union Admin. Bd. v. Regine*, 795 F.Supp. 59, 70 (D.R.I.1992) (citations omitted). A cause of action for misrepresentation requires a plaintiff to plead and prove one person's manifestation to another, by words or other conduct, that, under the circumstances, amounts to an assertion that is not in accordance with the facts. *Stebbins v.*

*Wells*, 766 A.2d 369, 372, n. 4 (R.I.2001)(quoting *Travers*, 682 A.2d at 473, n. 1 and *Halpert v. Rosenthal*, 107 R.I. 406, 267 A.2d 730, 734 (1970)). Since there is no evidence that the Mony Defendants or MML had any contact with Plaintiffs or made any representations to them regarding I[2] or any other product, this Court must also grant those Defendants summary judgment on Count III.

*The Mony Defendants did not make or Authorize Lemcke to make any Representations Regarding I[2] and are not Liable for Fraud or Misrepresentation.*

Lemcke was a registered representative of and field underwriter for the Mony Defendants between March of 1993 and August of 1995. *Lemcke Dep.*, at 320 & 325. Lemcke's activities during that time period were limited to selling Mony products and setting up college education programs for Plaintiffs' three children. *Pls.' Opp'n. to Mony Defs.*, at 3. *See also, Lemcke Dep.*, at 323. Plaintiffs have not alleged that any of these activities by Lemcke were false, deceptive, misleading, or fraudulent. There is no evidence that the Mony Defendants made any statements or representations with respect to I[2] upon which the Plaintiffs relied. Rather, the evidence indicates that every statement and representation regarding I[2] was made by Lemcke after he had ceased working for the Mony Defendants. *See Frank Fraioli Dep.*, at 68, 72–73. Plaintiffs, particularly, Dr. Fraioli, relied on Lemcke's statements and their close friendship, which developed before Lemcke began working for the Mony Defendants. *See id.*, at 64–65 & 149. This reliance on Lemcke, rather than on anything said by the Mony Defendants, caused Plaintiffs' injuries.

Since there is no evidence that the Mony Defendants had any direct contact with Plaintiffs, their liability, as it pertains to

the fraud and misrepresentation claims, depends on a finding of an agency relationship between Lemcke and the Mony Defendants. *See Transurface Carriers Inc. v. Ford Motor Co.*, 738 F.2d 42, 46 (1st Cir.1984); *Brandt v. U.S. Dep't. Of Veterans Affairs*, No. 99–197, 2000 WL 1879806, at *6 (D.Me. Dec.22, 2000)(both addressing whether or not an independent contractor acted with apparent authority). To establish an agency relationship there must be: 1)a manifestation by the principal that the agent will act for him; 2)acceptance by the agent of the undertaking; and 3)an agreement between the parties that the principal will control the undertaking. *Toledo v. Van Waters & Rogers Inc.*, 92 F.Supp.2d 44, 52 (D.R.I.2000)(quoting *Lawrence v. Anheuser–Busch, Inc.*, 523 A.2d 864, 867 (R.I.1987)(citing *Restatement (Second) Agency* § 1(1)(1958))). An agent's authority may be terminated when the agent or principal so notifies the other. *Restatement (Second) of Agency*, introductory note, at pg. 274 (1958). Termination by the principal revokes the agency relationship while an agent's termination operates as a renunciation of that relationship. *Id.* at § 118, comm. a.

The Mony Defendants entered into a Career Contract and a Registered Representative Contract with Lemcke in 1993. *See Defs. The Mony Group Inc. & Mony Secs. Corp.'s Concise Statement of Undisputed Facts Pursuant to Local Rule 12.1,* at *Ex. 3 & 4* (hereinafter, *Mony Defs.' Ex. 3 & 4* ). Those contracts manifested the Mony Defendants' consent for Lemcke to act on their behalf as a representative, Lemcke's acceptance of, and an agreement that the Mony Defendants would control that undertaking. However, the Mony Defendants revoked the agency relationship created by these contracts on August 17, 1995, before $I^2$ came into existence, when they notified Lemcke by letter that the contracts had been terminated effective August 15, 1995. *See id.*, at *Ex. 7.*

Therefore, there is no basis to hold the Mony Defendants liabile for Lemcke's subsequent acts of fraud or misrepresentation with respect to $I^2$ and the Mony Defendants' motion for summary judgment must be granted as to Count III.

*MML is not Liable for Fraud or Misrepresentation Because MML had no Contact with Plaintiffs and made no Statements with Respect to $I^2$ upon which Plaintiffs Relied.*

Plaintiffs have not responded to MML's motion for summary judgment with respect to Count III. Since there is no evidence that Plaintiffs had any contact with MML when $I^2$ was in existence, Plaintiffs' only conceivable argument is that there are issues of fact as to whether or not Lemcke acted with the apparent authority of MML, which would make MML liable for Lemcke's fraud and misrepresentations. *See Pls.' Opp'n. to MML,* at 13–15. However, since Plaintiffs' Amended Complaint does not allege that Lemcke acted with the apparent authority of MML, that issue is only before this Court with respect to Plaintiffs' Motion to File a Second Amended Verified Complaint and does not pertain to MML's motion for summary judgment.

There is no evidence that MML made any representations to Plaintiffs, let alone the false statements required to establish a prima facie case for fraud or misrepresentation. Plaintiffs never spoke with anyone at MML, had no accounts with, and never received any statements from MML. *Frank Fraioli Dep.*, at 404; *Louise Fraioli Dep.*, at 285. *See also, Aff. of James Furlong,* at para. 3. Plaintiffs began investing in $I^2$ long before Lemcke became affiliated with MML and Mrs. Fraioli did not know that Lemcke was an MML representative. *Frank Frailoi Dep.*, at 395; *Louise Fraioli Dep.*, at 290. There is no evidence that MML represented to Plain-

tiffs that Lemcke was licensed to sell securities or that Plaintiffs relied on any representations by MML when they decided to give Lemcke money to invest in I$^2$. In fact, Dr. Fraioli testified that no one at MML influenced him to open the I$^2$ accounts. *Frank Fraioli Dep.*, at 397. Rather, Dr. Fraioli relied on his personal trust of Lemcke, which developed long before Lemcke became affiliated with MML. *Id.* Dr. Fraioli never wrote a check to, had an account statement mailed to him, and was never told by anyone at MML that the entity was affiliated with I$^2$ in any manner. *Frank Fraioli Dep.*, at 404. Therefore, absent any evidence of a false representation by MML to Plaintiffs, MML is also entitled to summary judgment on Count III.

### Count IV: Respondeat Superior Liability

The doctrine of respondeat superior holds a principal liable for the torts of his or her agents that are committed in the course of their employment or within the scope of their authority. *Toledo v. Van Waters & Rogers Inc.*, 92 F.Supp.2d 44, 52 (D.R.I.2000)(citing *Giroux v. Murphy*, 88 R.I. 280, 147 A.2d 465, 466 (1959); *Conant v. Giddings*, 65 R.I. 79, 13 A.2d 517, 518 (1940); *Restatement (Second) of Agency*, § 214, cmt a (1958)). *See also Gray v. Wood*, 75 R.I. 123, 64 A.2d 191, 192 (1949)(holding that absent a master and servant relationship, the plaintiff may not rely on the doctrine of respondeat superior to claim that an act of the servant is also one of the master). An employer is not liable for the negligent acts of an independent contractor. *Toledo*, 92 F.Supp.2d at 52 (citations omitted); *East Coast Collision & Restoration Inc. v. Allyn*, 742 A.2d 273, 275 (R.I.1999); *Ballet Fabrics Inc. v. Four Dee Realty Co. Inc.*, 112 R.I. 612, 314 A.2d 1, 6 (1974). An independent contractor is one who is hired to perform a task according to his or her own skill and judgement and is not subject to the employer's control. *See United States v.*

*President & Fellows of Harvard Coll.*, 323 F.Supp.2d 151, 169 (D.Mass. 2004); *Toledo*, 92 F.Supp.2d at 53; *Ballet Fabrics*, 314 A.2d at 6.

*The Mony Defendants are not Liable under the Doctrine of Respondeat Superior Because they Employed Lemcke as an Independent Contractor and Alternatively, Lemcke's Fraudulent Activities were Beyond the Scope of his Employment with the Mony Defendants.*

The Mony Defendants' motion for summary judgment must be granted with respect to Count IV for three reasons. First, it is undisputed that the Mony Defendants employed Lemcke as an independent contractor, which shields those Defendants from respondeat superior liability for Lemcke's actions. *See Mony Defs.' Ex. 3 & 4*. Second, even if he was not an independent contractor, but rather an agent, Lemcke could not have acted within the scope of his employment with the Mony Defendants when he diverted Plaintiffs' funds because at that time, Lemcke was no longer affiliated with the Mony Defendants. *See Mony Mem.*, at 1–2; *Pls.' Opp'n. to Mony Defs.*, at 6; *Frank Fraioli Dep.*, at 68. Third, even if Lemcke was affiliated with the Mony Defendants during that time, his fraudulent investments through I$^2$ were beyond the scope of his employment contracts with the Mony Defendants, which only authorized Lemcke to sell Mony insurance policies. *See Mony Defs.' Ex. 3 & 4*. Therefore, Plaintiffs have not presented any issues of material fact with respect to their claim to respondeat superior liability against the Mony Defendants and this Court must grant summary judgment with respect to Count IV.

*MML does not have Respondeat Superior Liability for Lemcke's Actions Because it Employed Lemcke as an Independent Contractor and Lemcke's*

*Actions Regarding I [2] were Beyond the Scope of his Employment with MML.*

■■■■ Plaintiffs have neither responded to MML's motion for summary judgment with respect to Count IV nor provided this Court with any issues of material fact that would preclude summary judgment. Similar to his employment relationship with the Mony Defendants, MML employed Lemcke as an independent contractor thereby shielding itself from respondeat superior liability for Lemcke's actions. *See Statement of Undisputed Facts in Supp. of Def. MML Investors Servs. Inc.'s Mot. for Summ. J.*, at paras. 3 & 4; *Lemcke Dep.*, at 324. Alternatively, there is no evidence that Lemcke acted within the scope of his employment with MML when he created and induced Plaintiffs to invest in I [2]. Similar to the Mony Defendants, Lemcke's activities with respect to I [2] were beyond the scope of his employment agreement with MML. Lemcke testified that he knew that he was neither authorized nor licensed by MML to sell securities, that I [2] had not been approved by MML, and that it violated the rules associated with his NASD license. *Lemcke Dep.*, at 574. The establishment of fictitious accounts, such as I [2], is expressly prohibited by MML's Compliance Manual. *See Pls.' Concise Statement of Disputed Facts Pursuant to Rule 12.1*, at *Ex. F*, § 5.10, pg 34. In addition, Lemcke stated that Plaintiffs' file was his personal business and had nothing to do with MML, and that he never sold Plaintiffs any MML products or investments. *Lemcke Dep.*, at 565. Plaintiffs have not demonstrated that Lemcke's activities with respect to I [2] were anything other than private actions that were beyond the scope of his employment with MML. As such, MML is not liable under the doctrine of respondeat superior and is entitled to summary judgment on Count IV.

## Count V: Violation of the Securities Exchange Act of 1934

Count V alleges that the Mony Defendants and MML are liable under Section 78t(a) of the Securities Exchange Act ("Securities Act") because they directly or indirectly controlled Lemcke and breached a fiduciary duty by not properly investigating Lemcke's background and supervising his work. The Securities Act provides, in relevant part, that:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a)(1934). A cause of action under this statute contains two elements: 1)a primary violation of the securities laws; and 2)the defendant controlled the person or entity who engaged in the unlawful conduct. *Kafenbaum v. GTECH Holdings Corp.*, 217 F.Supp.2d 238, 251 (D.R.I.2002); *Lernout & Hauspie Secs. Litig.*, 286 B.R. 33, 39 (D.Mass.2002). The First Circuit has recognized, but not addressed, a split among the Circuit Courts as to whether or not a plaintiff must also prove that the defendants were culpable participants in the unlawful conduct. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85, n. 6 (1st Cir.2002). *Compare SEC v. First Jersey Secs. Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996); *Harrison v. Dean Witter Reynolds Inc.*, 974 F.2d 873, 877 (7th Cir. 1992)(both requiring culpable participation) *with Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990)(en banc); *G.A. Thompson & Co. Inc.*

*v. Partridge,* 636 F.2d 945, 958 (5th Cir. 1981)(both rejecting the culpable participation requirement). The Mony Defendants and MML focus on the second element and argue that Plaintiffs are unable to produce any evidence that they controlled or induced Lemcke to defraud Plaintiffs. *Mony Mem.,* at 15–16; *MML Mem.,* at 15. This Court agrees with both Defendants and grants summary judgment in their favor with respect to Count V.

To meet the control element, the alleged controlling person or entity must have the general power to and actually exercise control over the violator. *Aldridge,* 284 F.3d at 85(citing *Sheinkopf v. Stone,* 927 F.2d 1259, 1270 (1st Cir.1991)). The regulation promulgated under the Securities Act defines control as, "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. *See also Sheinkopf,* 927 F.2d at 1270; *Coleman & Co. Secs. Inc. v. Giaquinto Family Trust,* 236 F.Supp.2d 288, 306 (S.D.N.Y.2002). A broker-dealer has control person liability under the Securities Act with respect to its registered representatives, even when the representatives are independent contractors. *See Hollinger,* 914 F.2d at 1574.

A broker-dealer is not liable as a controlling person for investment advice given by its registered representative when: 1)an individual who is not employed by the broker-dealer gives investment advice to a third party, *see Coleman,* 236 F.Supp.2d at 306; 2)the market for the plaintiff's investments was established before the representative became associated with the broker-dealer and the plaintiff did not rely on the broker-dealer in deciding to make the investments that led to his or her losses, *see Fanelli v. Cypress Capital Corp.,* No. C–93–20105, 1994 WL 725427,

at *7–8 (N.D.Cal. Dec. 29, 1994); *Hollinger,* 914 F.2d at 1574 (noting that a broker-dealer's ability to deny a representative access to the market establishes the dealer's effective control over the representative at the most basic level); *Barnes v. SWS Fin. Servs. Inc.,* 97 S.W.3d 759, 765 (Tex.App.2003); or 3)the broker-dealer did not deal with the plaintiff and was unaware of and derived no benefits from the transactions at issue. *See Bradshaw v. Van Houten,* 601 F.Supp. 983, 985–86 (D. Ariz. 1985).

*The Mony Defendants were not Controlling Persons under the Securities Act Because Lemcke no Longer Worked for the Mony Defendants when he Advised Plaintiffs to Invest in I* [2].

The facts pertaining to the Mony Defendants' alleged control person liability for Lemcke's actions fit within the first situation discussed above. The Mony Defendants are not liable as controlling persons under the Securities Act for Lemcke's advice to Plaintiffs, beginning in 1996, to invest in I [2] because Lemcke was no longer employed by the Mony Defendants at that time. Even if the First Circuit required Plaintiffs to establish the Mony Defendants' culpable participation in I [2], doing so would be impossible because there is no evidence of any connection between the Mony Defendants and Lemcke after August of 1995 that would enable the Mony Defendants to control, direct, or induce Lemcke to establish I [2] and use it to defraud Plaintiffs. Since Plaintiffs have not presented any facts to indicate that the Mony Defendants were controlling persons under the Securities Act, summary judgment is appropriate as to Count V as well.

*MML was not a Controlling Person under the Securities Act Because MML did not Create the Market for I* [2], *Convince Plaintiffs to Invest in it, or Benefit from their I* [2] *Transactions.*

This Court grants summary judgment in favor of MML with respect to Plaintiffs' Securities Act claim for three reasons. First, Plaintiffs have not shown that Lemcke had access to I[2] solely because of his relationship with MML. *See Fanelli*, 1994 WL 725427, at *7–8. Second, there is no evidence that MML dealt with Plaintiffs regarding I[2], was aware of, or derived any benefits from those transactions. *See Bradshaw*, 601 F.Supp. at 985–6. Third, Plaintiffs relied on Lemcke rather than MML in deciding to invest in a fictitious entity. *See Barnes*, 97 S.W.3d at 765.[5]

As to the first reason, Plaintiffs have not shown that Lemcke had access to I[2] only because of his relationship with MML. Rather, the undisputed facts are that I[2] was a private investment company of Lemcke's own creation, which Plaintiffs began investing in prior to Lemcke's affiliation with MML. *See Pls.' Opp'n to MML*, at 6; *MML Mem.*, at 1. Lemcke knew that he was not licensed or authorized by MML to sell investments in I[2]. *Lemcke Dep.*, at 574.

Second, there is no evidence that MML dealt with Plaintiffs with respect to I[2], was aware of, or benefitted from those transactions. Plaintiffs did not receive any statements from MML. *Frank Fraioli Dep.*, at 404. Mrs. Fraioli never called anyone at MML until January of 2002 when she first found out that her money was gone. *Louise Fraioli Dep.*, at 285. Dr. Fraioli never had any contact with MML, not even when he learned that Lemcke had taken all of his wife's and later, his money. *Frank Fraioli Dep.*, at 406. Furthermore, Plaintiffs were never MML customers and thus, MML did not deal with Plaintiffs regarding I[2] or any accounts, had no knowledge of those transactions, and derived no commissions from Plaintiffs purported investments. *Aff. of James Furlong*, at para. 24: *Ex. B to Statement of Undisputed Facts in Supp. of Def. MML Investors Servs. Inc.'s Mot. for Summ. J.*

Third, the undisputed evidence indicates that Plaintiffs dealt exclusively with Lemcke, relied on their close relationship with him, and decided to enter a market created by Lemcke prior to his affiliation with MML and make the investments that led to their loss of approximately $1,000,000.00. *Fraioli Dep.*, at 397–98. *See also, Louise Fraioli Dep.*, at 290(testifying that she was unaware that Lemcke was an MML registered representative at the time he was handling her I[2] account). For all of these reasons, MML is not liable as a controlling person under the Securities Act and is entitled to summary judgment on Count V.

### Count VI: Violation of the Investment Advisors Act

The Investment Advisors Act ("IAA") makes it unlawful for an investment advisor to use the mails or any means or instrumentality of interstate commerce to directly or indirectly:

1)employ any device, scheme, or artifice to defraud a client or prospective client; 2)engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; 3)acting as a principal for his own account or as a broker for a person other than his or her client, to knowingly sell or purchase any security

---

5. Plaintiffs argue that there is an issue of fact as to whether or not MML acted in good faith when it knew of Lemcke's office in Hingham, MA that he used to conduct I[2] business and that could only operate on the funds that Lemcke embezzled from Plaintiffs. *Pls.' Opp'n. to MML*, at 15. However, this Court need not address that issue because MML is entitled to judgment as a matter of law with respect to the Securities Act claim and the issue of good faith pertains to a possible defense under the Securities Act.

from a client without first disclosing the transaction to and obtaining the written consent of each client; or 4)to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. 15 U.S.C. § 80b–6(1–4)(West 1997). When there is a violation of this statute, the clients of investment advisors may bring an action to void their investment contracts. *Transamerica Mortgage Advisors Inc. v. Lewis*, 444 U.S. 11, 17–18 & 24, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). However, they may not sue for money damages. *Id.* at 24, 100 S.Ct. 242. *See also Frank Russell Co. v. Wellington Mgmt. Co., LLP.*, 154 F.3d 97, 102 (3d Cir.1998); *Corwin v. Marney, Orton Invs.*, 788 F.2d 1063, 1066 (5th Cir.1986)(IAA claims properly dismissed where investors sought money damages rather than the voiding of an investment contract); *Goldstein v. Malcolm G. Fries & Assocs., Inc.*, 72 F.Supp.2d 620, 624 (E.D.Va.1999); *SSH Co. v. Shearson Lehman Bros. Inc.*, 678 F.Supp. 1055, 1058 (S.D.N.Y.1987).

*Plaintiffs are not Entitled to Money Damages under the IAA and do not have any Voidable Investment Contracts with the Mony Defendants or MML that Pertain to I[2].*

Plaintiffs did not seek the limited remedy under the IAA of rescinding their investment contracts with Lemcke, the Mony Defendants, or MML but instead sought money damages. *See v. Am. Compl.*, at para. 69. This relief is not available under the IAA. Furthermore, even if Plaintiffs had sought to rescind any investment contracts with the Mony Defendants and/or MML, that relief would also be unavailable. Plaintiffs closed all of their accounts with the Mony Defendants

and received all of the monies owed under those policies in order to make investments in I[2]. *See Frank Fraioli Dep.*, at 436; *Defs. The Mony Group & Mony Secs. Corp.'s Concise Statement of Undisputed Facts Pursuant to Local Rule 12.1*, at *Ex. 9 & 10*. There is no evidence that any investment contracts exist between Plaintiffs and MML. *Aff. of James Furlong*, at para. 3. Therefore, the Mony Defendants and MML are entitled to summary judgment on Count VI as well.

### Count VII: The Rhode Island Uniform Securities Act [6]

The Rhode Island Uniform Securities Act ("RIUSA") states that in connection with an offer to sell or purchase or a sale or purchase of a security, a person may not directly or indirectly: 1)employ a device, scheme, or artifice to defraud; 2)make an untrue statement of a material fact or omit a material fact that would ensure that the statement is not misleading; or 3)engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon a person. R.I. Gen. Laws § 7–11–501 (West 2003). The RIUSA holds one who offers to or sells a security in violation of this Section, directly or indirectly controls the person offering or selling said security, and/or a broker-dealer who materially aids in the act, omission, or transaction jointly and severally liable for the above violations. R.I. Gen. Laws § 7–11–605 (West 2003).

*The Mony Defendants and MML are Entitled to Summary Judgment on Count VII Because they did not make any Untrue Statements or Pursue a Course of Business that Defrauded Plaintiffs.*

---

**6.** Plaintiffs' proposed Second Amended Verified Complaint does not contain a count for violations of the Rhode Island Uniform Securities Act. *See Attachment to Pls.' Mot. to File*

a *Second Am. v. Compl.* However, this Court will address that statute as it relates to the present motions for summary judgment with regard to the Amended Complaint.

Although there is no Rhode Island case law interpreting this statute, this Court concludes that Plaintiffs have not presented any evidence that raises issues of material fact with respect to their claims under the RIUSA. While Lemcke's actions through the use of $I^2$ may constitute violations under each of the above subsections, there is no evidence of similar violations by the Mony Defendants or MML. $I^2$, the device and course of business that defrauded Plaintiffs and about which Lemcke made untrue statements of material facts, was a fictitious entity created by Lemcke after he terminated his employment with the Mony Defendants. *Mony Mem.*, at 1–2; *Pls.' Opp'n. To Mony Defs.*, at 2 & 6. Since there are no issues of fact regarding the Mony Defendants' liability under the RIUSA, this Court grants summary judgment in favor of the Mony Defendants on Count VII as well.

Likewise, Plaintiffs have not presented any material issues of fact regarding their same claim against MML and did not address this count in their opposition to MML's motion for summary judgment. There is no evidence that MML was aware of or materially aided in any of Lemcke's activities with respect to $I^2$. Since Plaintiffs never had any contact with anyone at MML while they were investing in $I^2$, there is no conceivable set of facts that would present an issue as to whether or not MML made untrue statements to or engaged in a practice or course of business aimed at defrauding Plaintiffs. *See Louise Fraioli Dep.*, at 285; *Frank Fraioli Dep.*, at 406. Therefore, MML is also entitled to summary judgment on Count VII.

In sum, there are no issues of material fact regarding any of Plaintiffs' claims against the Mony Defendants or MML. Plaintiffs' claims for negligent hiring and supervision and for breach of fiduciary duty fail because there is no evidence that these Defendants owed Plaintiffs any duty during the time that Lemcke was operating $I^2$ and embezzling Plaintiffs' money. During that time, there is no evidence that the Mony Defendants or MML made any statements or representations to Plaintiffs regarding $I^2$ or that they acted as controlling persons within the meaning of the Securities Act. Plaintiffs' claims under the IAA also fail because that statute does not provide for the recovery of money damages and there is no evidence that investment contracts arising out of $I^2$ existed between Plaintiffs and the Mony Defendants or between Plaintiffs and MML. Similarly, there is no evidence that either of these Defendants were aware of or materially aided in any of Lemcke's fraudulent activities, which defeats Plaintiffs' claims under the RIUSA. For all of these reasons, the motions of the Mony Defendants and MML for summary judgment are granted on all counts asserted in the Amended Complaint.

### Boston Partners' Motion for Summary Judgment

This Court allowed Plaintiffs to amend their Complaint to add Defendant, Boston Partners, to this lawsuit in June of 2003 following the deposition testimony of Lawrence Nihland, ("Nihland"). Nihland, a John Hancock employee, testified that he was the person with the most knowledge regarding the relationships between the Boston General Agency and Signator Investors and between John Hancock and Signator. *Nihland Dep.*, at 28–30. John Hancock and Signator designated Nihland as the person with the most knowledge regarding Lemcke and his employment with those entities under Rule 30(b)(6) of the Federal Rules of Civil Procedure. *Mem. of Law in Supp. of Def. Boston Partners Ins.'s Mot. for Summ. J.*, (hereinafter, *Boston Partners' Mem.*) at *Ex. 5.*

A brief chronology may be helpful. Healey became associated with John Han-

cock in 1995 and served as general agent for the entity known internally as the Boston General Agency ("BGA"). *Nihland Dep.*, at 137–38. Lemcke began working for John Hancock on August 25, 1995. *Lemcke Dep.*, at 128. According to Nihland, Lemcke worked with Healey and was affiliated with the BGA, which is not a subsidiary of any John Hancock entity. *Nihland Dep.*, at 137–38. Lemcke began the fraudulent activities that are the subject of this lawsuit in January of 1996 and the next year, Healey changed the name BGA to Hancock Partners 103. *Id.* at 139. Nihland stated that Hancock Partners 103 has since changed its name for marketing reasons and Nihland believes that it is now known as Boston Partners Insurance. *Id.* at 140. Lemcke terminated his relationship with John Hancock in December of 1999. *Boston Partners' Mem.*, at 2–3. In July of 2001, Mark Marroni, ("Marroni") another John Hancock employee, became general agent for the entity known internally as Northern New England Agency 057, ("NNEA 057"). *Aff. of Mark Marroni*, at paras. 4 & 5. Neither Healey nor Lemcke was ever associated with NNEA 057 or Marroni. *Id.* at paras. 6 & 7. In October of 2002, NNEA 057 changed its name to Boston Partners General Agency 103. *Id.* at para. 11.

Boston Partners argues that it is entitled to summary judgment on all counts because it is not a successor in interest to any John Hancock agency, including any agency formerly involved with Lemcke. *Boston Partners' Mem.*, at 4–5. Plaintiffs argue that there are issues of fact as to the successor liabilities between Boston Partners General Agency 103 and Hancock Partners 103 and between Boston Partners General Agency 103 and BGA 103, and thus, summary judgment is inappropriate. Plaintiffs' base these arguments on Nihland's testimony and the fact that Boston Partners has the same agency identification number as the Boston General Agency and Hancock Partners. *Pls.' Opp'n. to Mot. for Summ. J. Filed by Boston Partners Ins.*, at 5.

A corporation may acquire the assets of another corporation without assuming the acquired corporation's debts and liabilities. *Ed Peters Jewelry Co. Inc. v. C & J Jewelry Co., Inc.*, 124 F.3d 252, 266 (1st Cir.1997); *Carreiro v. Rhodes Gill & Co., Ltd.*, 68 F.3d 1443, 1447 (1st Cir.1995); *Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 692 (1st Cir.1984); *H.J. Baker & Bro., Inc. v. Orgonics, Inc.*, 554 A.2d 196, 205 (R.I.1989)(citing *Cranston Dressed Meat Co. v. Packers Outlet Co.*, 57 R.I. 345, 190 A. 29, 31 (1937)); Phillip I. Blumberg, *The Law of Corporate Groups*, § 13.05.1, at 278 (1994). There are exceptions to this rule that make the acquiring corporation liable as a successor in interest if that corporation expressly assumed existing debts, there was a de facto merger, the acquisition involved a transfer of assets in order to defraud creditors, or one corporation is a "mere continuation" of the other. *Id. See also*, 3 James D. Cox & Thomas Lee Hazen, *Cox & Hazen on Corporations*, § 22.08, at 1324 (2003 & 2004 Supp.). Since Lemcke has not had any employment relationship with any John Hancock entity since December of 1999, the only way for Boston Partners to be liable on any of the causes of action presented in the Amended Complaint is for Plaintiffs to demonstrate that Boston Partners is a successor in interest to John Hancock or one of its entities under one of the above exceptions. *See Dayton*, 739 F.2d at 692. Plaintiffs rely on the mere continuation exception to establish Boston Partners' successor liability and have not argued any of the other exceptions to this Court. *See v. Am. Compl.*, at para. 8.

The mere continuation exception prevents one corporation from acquiring the assets of another for the specific pur-

pose of placing those assets beyond the reach of the acquired corporation's creditors. *Ed Peters Jewelry Co.*, 124 F.3d at 268 (citing *Nissen Corp. v. Miller*, 323 Md. 613, 594 A.2d 564, 566 (1991)). The exception applies when the acquiring corporation maintains the same or similar management and ownership but wears a different hat. *Id.See also, Kelly v. Kercher Mach. Works, Inc.*, 910 F.Supp. 30, 36 (D.N.H.1995)(noting that the mere continuation exception applies whenever the successor corporation more closely resembles a reorganized version of its predecessor than an entirely new corporate entity). The mere continuation exception is multifaceted and usually requires the factfinder to engage in a cumulative, case by case assessment of the evidence as it relates to five circumstances.[7] However, in order to apply the exception, the Rhode Island Supreme Court has required that at a minimum, there be evidence of a transfer of assets between the old and new corporations. *Kondracky v. Crystal Restoration Inc.*, 791 A.2d 482, 483 (R.I.2002); *Carreiro*, 68 F.3d at 1447 & 1449. (concluding that the Rhode Island Supreme Court would not find successor liability under the "mere continuation" doctrine absent any evidence of an inter-corporate asset transfer). A court may grant summary judgment where the record contains uncontroverted testimony that this requisite transfer of assets did not take place. *See Carreiro*, 68 F.3d at 1449.

There is no evidence that John Hancock or Signator transferred assets or liabilities to any agency known internally as Boston Partners General Agency 103. *Statement of Undisputed Facts in Supp. of Def. Boston Partners' Mot. for Summ. J.*, at para

15 and at *Ex. 2: Def. John Hancock Life Ins. Co.'s Resp. to Def. Boston Partners Ins.' Req. for Admiss.*, (hereinafter, *Boston Partners Ex. 2* ) at 11. Boston Partners Insurance and Boston Partners General Agency 103 are not registered business entities. *Boston Partners Ex. 2*, at 10–11. Boston Partners has presented the affidavit of Mark Marroni, the general agent of Boston Partners General Agency 103, which states that: 1)Boston Partners General Agency 103 is not a successor in interest to Boston General Agency 103 or any agency formerly run and/or supervised by Jeremiah Healey; and 2)neither John Hancock nor any of its subdivisions, agencies, individuals, representatives, agents, servants, or employees ever conferred any interest or liability upon the agency known internally as Boston Partners General Agency 103. *Aff. of Mark Marroni*, at paras. 12, 13.

Plaintiffs have not presented any evidence to rebut these assertions and rely instead on Nihland's speculation and understanding that Hancock Partners changed its name and is now known as Boston Partners Insurance. *See Nihland Dep.*, at 140. Nihland did not testify that Boston Partners was the continuation of the BGA. Rather, he assumed that the similar names indicated a similar relationship. This is not nearly enough to establish that Boston Partners is liable to Plaintiffs as a successor in interest to John Hancock or to create an issue of fact regarding the mere continuation exception. Absent a theory of successor liability, there is no basis to hold Boston Partners liable for any of the causes of action asserted in the Amended Complaint. As such, this Court grants Boston Partners'

---

7. *See United States v. Davis*, 261 F.3d 1, 53 (1st Cir.2001); *Ed Peters Jewelry Co.*, 124 F.3d at 268 (citations omitted); *Casey v. San–Lee Realty, Inc.*, 623 A.2d 16, 19 (R.I.1993); *H.J. Baker & Bro.*, 554 A.2d at 205(citing *Jackson v. Diamond T. Trucking Co.*, 100 N.J.Super. 186, 241 A.2d 471, 477 (1968)); *Blumberg, supra*, at § 13.05.4, p. 283 (all listing the five circumstances).

motion for summary judgment on all counts.

### Plaintiffs' Motion to File a Second Amended Verified Complaint

Plaintiffs have moved to file a Second Amended Verified Complaint eliminating Count VII, which alleged violations of the Rhode Island Uniform Securities Act and adding counts for apparent authority and joint and several liability against each institutional Defendant (Counts VII and VIII respectively), conversion against Lemcke (Count IX), and successor liability against Boston Partners (Count X). The Mony Defendants, MML, John Hancock, and Signator have objected to Plaintiffs' motion to amend to add counts for apparent authority and joint and several liability arguing that the amendments are futile because they do not state claims upon which relief can be granted, and alternatively, are unduly prejudicial at this stage of the litigation. *See Mem in Supp. of Opp'n. of Defs. The Mony Group and Mony Secs. Corp. to Pls.' Mot. to File a Second Am. V. Compl.,* at 3; *Def. MML Investors Servs. Inc.'s Mem. of Law in Supp. of its Opp'n. to Pls.' Mot. to File a Second Am. V. Compl.,* at 4; *Opp'n. of Defs. John Hancock Life Ins. Co. & Signator Investors, Inc. to Pls.' Mot. for Leave to File a Second Am. V. Compl.,* at 1. Boston Partners makes the same objection with respect to the proposed count against that entity for successor liability. *Defs.' Objection to Pls.' Mot. to File a Second Am. V. Compl.,* at 1–2. There has been no objection to Plaintiffs' proposed count for conversion against Lemcke.

### Plaintiffs' Proposed Count VII for Apparent Authority Against the Institutional Defendants

In order to add their new proposed Count VII for apparent authority against the institutional Defendants, Plaintiffs must show that their proposal states a claim upon which relief can be granted.

*See Almeida,* 50 F.Supp.2d at 120; *Schock,* 21 F.Supp.2d 115, 124 (D.R.I.1998). The Mony Defendants, MML, and Boston Partners argue that Plaintiffs cannot make this showing and thus, the motion to amend should be denied. Once again, this Court agrees with Defendants.

▮ Apparent authority is an agent's or other actor's power to affect its principal's liabilities to third parties. *Restatement (Third) Agency* § 2.03 (Tentative Draft No. 2, 2001). To establish apparent authority under Rhode Island law, a plaintiff must show that: 1)the principal manifestly consented to or knowingly permitted the agent to exercise the principal's authority; 2)a third person knew of this fact and, acting in good faith, had reason to believe and actually did believe that the agent possessed such authority; and 3)in reliance on this appearance of authority, the third person changed his position and will be injured or suffer a loss if the act or transaction does not bind the principal. *Bates v. Shearson Lehman Bros. Inc.,* 42 F.3d 79, 82 (1st Cir.1994)(quoting *Am. Title Ins. Co. v. East West Fin.,* 16 F.3d 449, 454 (1st Cir.1994); *Calenda v. Allstate Ins. Co.,* 518 A.2d 624, 628 (R.I.1986)). *See also Lawton v. Nyman,* 62 F.Supp.2d 533, 538 (D.R.I.1999); *Restatement (Third) of Agency,* § 3.03 (Tentative Draft No.2, 2001). Apparent authority may arise from indicia of authority given by the principal to the agent and does not have to be in the form of a direct communication to a third person. *731 Airport Assocs. v. H & M Realty Assocs.,* 799 A.2d 279, 283 (R.I.2002)(quoting *Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Sys.,* 539 A.2d 523, 526 (R.I.1988)). When this apparent authority is established, a principal is liable for his or her agent's actions. *See Restatement (Third) of Agency,* at § 2.03, cmmt. c. The doctrine of apparent authority exists to promote business and

protect a third party's reasonable reliance on an agency relationship. *Schock*, 56 F.Supp.2d at 194.

■■■■■ The focus of an apparent authority inquiry is on the conduct of the principal, rather than that of the putative agent. *Bates*, 42 F.3d at 82 (citing *Commercial Assocs. v. Tilcon Gammino Inc.*, 998 F.2d 1092, 1099 (1st Cir.1993)). An agent's success in misleading a third party as to the agent's authority does not, alone, make the principal liable. *Restatement (Third) of Agency*, at § 2.03, cmmt c. In addition, a third party's belief in an agent's authority to act on behalf of the principal must be reasonable. *Bates*, 42 F.3d at 82 (citing *Rodrigues*, 623 A.2d at 456). A belief resulting solely from an agent's statements or conduct that is unsupported by any manifestations traceable to the principal does not create apparent authority. *Restatement (Third) of Agency*, at § 2.03, cmmt c. Apparent authority terminates and a principal is no longer bound by the actions of his or her agent when the third party receives notice that the agent and principal have terminated their relationship or of an event that makes it reasonable for the third party to infer that the principal no longer consents to the agent's acting on the principal's behalf. *Schock*, 56 F.Supp.2d at 194; *Schock v. United States*, 21 F.Supp.2d 115, 121–22 (D.R.I. 1998); *Restatement (Second) of Agency*, § 125 & cmts. a & c.

*Plaintiffs are Unable to State a Cause of Action for Apparent Authority Against The Mony Defendants Because any such Authority Terminated Before Lemcke Began Defrauding Plaintiffs.*

■■■■■ Any apparent authority held by Lemcke to act on the Mony Defendants' behalf terminated in the summer of 1995 when Lemcke told Dr. Fraioli that he had terminated his employment with the Mony Defendants and was going to work for John Hancock. *See Frank Fraioli Dep.,*

at 66 & 437. Once Dr. Fraioli heard this, it was no longer reasonable for him to infer that the Mony Defendants had consented to Lemcke's continuing to act on their behalf. Lemcke had already left the Mony Defendants' employ and notified Dr. Fraioli of such when he told Dr. Fraioli about I [2] and began embezzling Plaintiffs' money in early 1996. *Frank Fraioli Dep.,* at 66 & 72. At that time, Lemcke no longer had any apparent authority to act on the Mony Defendants' behalf and thus, those Defendants are not liable for the fraud that Lemcke committed between 1996 and 2001. It would be futile for Plaintiffs to amend the Complaint to add a count alleging apparent authority against the Mony Defendants because that is not a claim upon which relief can be granted. Therefore, Plaintiffs' motion to do so is denied.

*Plaintiffs are Unable to State a Cause of Action for Apparent Authority Against MML Because there is no Evidence that Plaintiffs Relied on or Dealt with MML with Respect to their Investments in I [2].*

■■■■■ It would also be futile to add a count for apparent authority against MML because there are no facts that would establish the required elements of that cause of action. As to the first element of an apparent authority claim, it was impossible for MML to manifest to Plaintiffs its consent for Lemcke to act on MML's behalf with respect to I [2] because Plaintiffs never dealt with anyone from MML until early 2002 and after Lemcke's fraud was uncovered. *See Louise Fraioli Dep.,* at 286. Dr. Fraioli's deposition testimony precludes Plaintiffs from establishing the second and third elements required for apparent authority because Dr. Fraioli acknowledged that he relied on his personal trust in Lemcke rather than any statements or actions by MML when he

decided to open his I$^2$ accounts. *Frank Fraioli Dep.*, at 397. This trust and Dr. Fraioli's investments in I$^2$ began before Lemcke became affiliated with MML. *See id.* Therefore, the evidence before this Court does not support a claim for apparent authority against MML.

Plaintiffs argue that Lemcke led them to believe that they were MML customers by stating that Plaintiffs' three children had MML insurance policies and by giving Dr. Fraioli a business card from MML. *Pls.' Opp'n. to MML*, at 6, 15; *Pls.' Concise Statement of Disputed Facts Pursuant to Local Rule 12.1*, at *Ex. D.* However, Plaintiffs' testimony that they never opened accounts with MML, did not visit MML's offices, never received any statements from or wrote any checks to MML, and were unaware that Lemcke was working for MML makes it impossible for Plaintiffs to reasonably believe that MML authorized Lemcke to act on its behalf with respect to I$^2$. *See Frank Fraioli Dep.*, at 404; *Louise Fraioli Dep.*, at 285 & 290.

The above facts are identical to those presented to the First Circuit in *Bates v. Shearson Lehman Brothers*, 42 F.3d 79, 81 (1st Cir.1994), where the defendant's agent diverted $70,000.00 of the plaintiff's funds into the agent's personal account. The Court found no evidence of any representation or conduct by the defendant to make it reasonable to conclude that the agent had the apparent authority to act on the defendant's behalf because the plaintiff had no accounts with, never wrote a check to, and was never told that her funds would be invested with the defendant. *Id.* at 82–3. The facts and result in this case are the same: Plaintiffs are unable to state a claim for apparent authority against MML. Therefore, amending the Complaint to add such a claim would be futile and Plaintiffs' motion to do so hereby, is denied.

*There is no Evidence to Support a Claim for Apparent Authority Against Boston Partners Because Boston Partners is Neither a Successor in Interest to any John Hancock Entity nor Related to Lemcke and his Activities with I$^2$.*

Plaintiffs motion to amend to add a count for apparent authority against Boston Partners must also be denied because Plaintiffs do not present any facts to make this a viable claim upon which relief can be granted. As discussed above, Boston Partners is neither a successor in interest to any John Hancock entity nor a registered business entity in its own right. Lemcke and Healey never worked for Mark Marroni, the general agent of Boston Partners. *Aff. of Mark Marroni*, at paras. 1 & 6. Therefore, it was impossible for Marroni or Boston Partners to manifest any consent to Plaintiffs that Lemcke was authorized to act on Boston Partners' behalf. Plaintiffs have not presented any evidence that would make it reasonable for them to rely on Lemcke as a Boston Partners' agent when they made their decisions to invest in I$^2$. Since Plaintiffs lack the evidence to present a viable claim for apparent authority against Boston Partners, adding such a count would be futile and thus, their motion to amend must be denied.

*There is Evidence that Dr. Fraioli Relied on Lemcke's Relationship with John Hancock when he Decided to Invest in I$^2$ and thus, it would not be Futile to add a Count for Apparent Authority Against John Hancock and its Subsidiary, Signator.*

It would not be futile to amend the Complaint to add allegations that Lemcke acted with the apparent authority of John Hancock and its subsidiary, Signator. The evidence presented indicates that Lemcke became an agent and registered representative of John Hancock in June of

1995, with his employment contract demonstrating John Hancock's consent for Lemcke to act on its behalf. *See Lemcke Dep.,* at 128. Dr. Fraioli knew that Lemcke was a John Hancock registered representative and believed that anything Lemcke sold him was endorsed by that entity. *Frank Fraioli Dep.,* at 91. Although Dr. Fraioli did not know the exact relationship between I[2] and John Hancock, Dr. Fraioli believed that Lemcke had told him that I[2] was endorsed by John Hancock. *Id.,* at 91. Dr. Fraioli relied on Lemcke's relationship with John Hancock when he made the decisions to invest in I[2] as evidenced by his belief that the relationship allowed Dr. Fraioli to "sleep better at night," *id.* at 402, and made him more confident, secure, and comfortable with what Lemcke was doing with his money. *Id.,* at 65 & 90. Unlike the situation with MML, Plaintiffs received checks from John Hancock, *id.,* at 132, paid attention to how their John Hancock stock was doing, *id.,* at 379, and called John Hancock at one point to inquire as to why one of their insurance policies had lapsed. *Id.,* at 135. This testimony supports the elements of a cause of action for apparent authority and negates any argument that it would be futile to amend the Complaint to add such a count against John Hancock and Signator.

John Hancock and Signator argue that amending the Complaint would cause them undue prejudice because discovery has closed and alternatively, even if discovery were reopened, they would incur additional expenses in deposing or redeposing witnesses. *Opp'n. of Defs. John Hancock Life Ins. Co. & Signator Investors, Inc. to Pls.' Mot. for Leave to File a Second Am. V. Compl.,* at 1. An undue delay in seeking to amend a complaint may be a sufficient basis for denying leave to amend when granting the motion will further delay the proceedings. *Harvey v. Snow,* 281 F.Supp.2d at 380. In *Harvey,* this Court denied a motion to amend to add an additional plaintiff citing undue delay because discovery would have to be reopened in order to examine previously undiscussed issues of liability. *See id.* (discussing *Acosta–Mestre v. Hilton Int'l. of Puerto Rico,* 156 F.3d 49, 51 (1st Cir.1998)).

Unlike *Harvey,* Plaintiffs do not seek to add an entirely new party in a manner that would further delay this litigation. Rather, Plaintiffs seek to assert a cause of action that was uncovered during the extensive depositions of Healey, Lemcke, and Dr. Fraioli taken by all of the parties in this case, including John Hancock and Signator. This Court does not see any need to re-open those depositions or any undue delay or prejudice resulting from allowing Plaintiffs to amend their Complaint.

Amending the Complaint, albeit a second time, to allege apparent authority against John Hancock and Signator clarifies one of the grounds on which Plaintiffs base their claims for relief. For example, Count III of the Amended Complaint seeks damages for alleged fraud and misrepresentation that may be attributable to John Hancock and Signator on a theory of apparent authority, whereas other counts, such as those for negligent hiring and supervision (Count I) or for violations of the Securities Act (Count V) seek to hold those Defendants liable for their own alleged acts and omissions with regard to Lemcke. Unlike the situation presented in *Harvey,* Plaintiffs' proposed amendments pertaining to the alleged apparent authority of John Hancock and Signator do not inject any new theories or parties into this case. Instead, they clarify a ground for recovery, which may have existed when Plaintiffs filed their initial Complaint and throughout discovery. As such, it would not be prejudicial to allow Plaintiffs to amend the Complaint at this point. Unlike the same proposed amendment with re-

spect to the Mony Defendants, MML, and Boston Partners, Plaintiffs have alleged facts that would support a cause of action for apparent authority against John Hancock and Signator. Therefore, Plaintiffs' motion to amend and add their proposed Count VII against John Hancock and Signator is granted.

### Plaintiffs' Proposed Count VIII for Joint and Several Liability Against Each Institutional Defendant

Plaintiffs seek leave to amend the Complaint to add a cause of action for joint and several liability for each institutional Defendant's alleged failure to properly control and/or supervise Lemcke and for allowing Lemcke to engage in his scheme of fraud and embezzlement. *See Pls.' Proposed Second Am. v. Compl.* at para. 78. However, joint and several liability is a request for relief or a rule of contribution: it is not a cause of action. *See Tilcon Capaldi, Inc. v. Feldman,* 249 F.3d 54, 62 (1st Cir.2001)(noting that at common law, the phrase "joint and several" refers to the liability of multiple wrongdoers); *Dellefave v. Access Temps., Inc.,* No. 99 Civ. 6098, 2000 WL 45720 at *3 (S.D.N.Y. Jan.19, 2000)(dismissing a claim for joint and several liability because it did not state a cause of action); *accord Chase–Walton Elastomers, Inc. v. Bennett,* No. 02–1304, 2002 WL 31235508 at *7 (Mass.Super.Oct.1, 2002); *Ahmed v. Goldberg,* No. 99–0046, 2001 WL 1842390 at *4 (D.N.Mar.I. Mar. 1, 2001); *Gudaitis v. Great Atl. & Pac. Tea Co., Inc.,* No. 97007423, 1998 WL 46263 at *2 (Conn.Super.Jan.26, 1998). Therefore, amending the Complaint to allege joint and several liability against each institutional Defendant would be futile because it would fail to state a claim upon which relief could be granted. As such, Plaintiffs' motion to amend is denied with respect to their proposed Count VIII.

### Plaintiffs' Proposed Count IX for Conversion Against Lemcke

Plaintiffs also propose amending the Complaint to add a count for conversion against Lemcke. Plaintiffs allege that between 1996 and 2001, Lemcke intentionally and purposefully took funds provided to him by Plaintiffs and converted those funds to his own use. *Pls.' Proposed Second Am. v. Compl.,* at para. 85. Lemcke has not filed any objection to Plaintiffs' motion to amend with respect to this proposed count since he has already been defaulted.

In order to state a cause of action for conversion under Rhode Island law, a plaintiff must allege and prove that the defendant took and exercised control over the plaintiff's property without the plaintiff's permission and in a manner inconsistent with the plaintiff's legal right to possession of that property. *See DeChristofaro v. Machala,* 685 A.2d 258, 262 (R.I. 1996); *Fuscellaro v. Indus. Nat'l. Corp.,* 117 R.I. 558, 368 A.2d 1227, 1230 (1977)(citing *Iavazzo v. R.I. Hosp. Trust Co.,* 51 R.I. 459, 155 A. 407, 408 (R.I. 1931)); *Terrien v. Joseph,* 73 R.I. 112, 53 A.2d 923, 925 (1947). In this case, it is undisputed that Lemcke used $I^2$ to take and exercise control over Plaintiffs' money. *Statement of Undisputed Facts in Supp. of Def. MML Investors Servs. Inc.'s Mot. for Summ. J.,* at pg 6. While the evidence produced thus far demonstrates that Dr. Fraioli gave Lemcke permission to invest Plaintiffs' money in $I^2$, he did so under the impression that he would get a better rate of return and build up his investment portfolio. *Id.* at 4,7; *Frank Fraioli Dep.,* at 430. Lemcke never invested these funds as promised and instead converted them, without Plaintiffs' permission or knowledge, for his own use in developing and maintaining an extravagant lifestyle. *Statement of Undisputed Facts in Supp.*

*of Def. MML Investors Servs. Inc.'s Mot. for Summ. J.*, at 6. *See also, Lemcke Dep.*, at 231. Plaintiffs have alleged and the evidence presented supports a cause of action for conversion against Lemcke such that it would not be futile to so amend the Complaint. Therefore, this Court grants Plaintiffs' motion to add Count IX for conversion against Lemcke.

### Plaintiffs' Proposed Count X for Successor Liability Against Boston Partners

Plaintiffs ask this Court for leave to amend to add their proposed Count X alleging successor liability against Boston Partners. Allowing Plaintiffs to do so would be an exercise in futility for the reasons previously discussed with regard to Boston Partners' Motion for Summary Judgment. Therefore, Plaintiffs' motion to add their proposed Count X is denied.

### IV. Conclusion

For the foregoing reasons, the Mony Defendants, MML, and Boston Partners are entitled to summary judgment on all counts asserted against them in the Amended Complaint. Plaintiffs' Motion for Leave to File a Second Amended Complaint is granted in part and denied in part. That motion is denied with respect to the following proposed counts: Count VII alleging apparent authority against the Mony Defendants, MML, and Boston Partners; Count VIII alleging joint and several liability against each institutional Defendant; and Count X alleging successor liability against Boston Partners. Plaintiffs' motion to amend is granted with respect to their proposed Count VII alleging apparent authority against John Hancock and Signator and Count IX alleging conversion against Lemcke.

As a result of this disposition, the Mony Defendants, MML, and Boston Partners will be entitled to judgment at the appropriate time in this case. What remains are all counts asserted in the Amended Complaint against John Hancock, Signator, and Lemcke and the counts for apparent authority and conversion, which Plaintiffs now have leave to add. This Court also has a pending motion by Plaintiffs to enter a final default judgment against Lemcke. The Court will not consider that matter until all other claims are resolved, and no judgments shall enter until all claims have been resolved.

It is so ordered.